BOARD OF GOVERNORS OF THE FEDERAL RESERVE
SYSTEM *v.* FIRST LINCOLNWOOD CORP.

No. 77–832. Argued October 11, 1978—Decided December 11, 1978

MARSHALL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, WHITE, BLACKMUN, and POWELL, JJ., joined. STEVENS, J., filed a dissenting opinion, in which REHNQUIST, J., joined, *post*, p. 254.

*Stephen M. Shapiro* argued the cause for petitioner. With him on the briefs were *Solicitor General McCree, Assistant Attorney General Babcock, Harriet S. Shapiro, Ronald R. Glancz, Neal L. Petersen,* and *J. Virgil Mattingly.*

*George B. Collins* argued the cause and filed a brief for respondent.[*]

MR. JUSTICE MARSHALL delivered the opinion of the Court.

Section 3 (a) of the Bank Holding Company Act of 1956, 12 U. S. C. § 1842 (a), prohibits any company from acquiring control of a bank without prior approval by the Board of Governors of the Federal Reserve System (Board).[1] Under § 3

---

[*]*Horace R. Hansen* and *Wayne P. Dordell* filed a brief for the Independent Bankers Association of America urging affirmance.

[1] More specifically, § 3 (a), 70 Stat. 134, as amended, 80 Stat. 237, 12 U. S. C. § 1842 (a), provides in pertinent part:

"It shall be unlawful, except with the prior approval of the Board, (1) for any action to be taken that causes any company to become a bank holding company; (2) for any action to be taken that causes a bank to become a subsidiary of a bank holding company; (3) for any bank holding company to acquire direct or indirect ownership or control of any voting shares of any bank if, after such acquisition, such company will directly or indirectly own or control more than 5 per centum of the voting shares of such bank; (4) for any bank holding company or subsidiary thereof, other

(c)(1) of the Act, 12 U. S. C. § 1842 (c)(1), the Board may not approve a transaction that would create a monopoly or further an attempt to monopolize the business of banking. In addition, it must disapprove a transaction that would generate anticompetitive effects not clearly outweighed by beneficial effects upon the bank's ability to serve the community. § 1842 (c)(2). The final sentence of § 3 (c) directs that

> "[i]n every case, the Board shall take into consideration the financial and managerial resources and future prospects of the company or companies and the banks concerned, and the convenience and needs of the community to be served."[2]

---

than a bank, to acquire all or substantially all of the assets of a bank; or (5) for any bank holding company to merge or consolidate with any other bank holding company."

Section 2 (a)(1) of the Act, 70 Stat. 133, as amended, 84 Stat. 1760, 12 U. S. C. § 1841 (a)(1), defines a "bank holding company" as "any company which has control over any bank or over any company that is or becomes a bank holding company by virtue of this Act."

A company has "control" over a bank or over any company if

"(A) the company directly or indirectly or acting through one or more other persons owns, controls, or has power to vote 25 per centum or more of any class of voting securities of the bank or company;

"(B) the company controls in any manner the election of a majority of the directors or trustees of the bank or company; or

"(C) the Board determines, after notice and opportunity for hearing, that the company directly or indirectly exercises a controlling influence over the management or policies of the bank or company." § 2 (a)(2) of the Act, 70 Stat. 133, as amended, 84 Stat. 1760, 12 U. S. C. § 1841 (a)(2).

[2] In its entirety, § 3 (c) provides:

"The Board shall not approve—

"(1) any acquisition or merger or consolidation under this section which would result in a monopoly, or which would be in furtherance of any combination or conspiracy to monop[o]lize or to attempt to monopolize the business of banking in any part of the United States, or

"(2) any other proposed acquisition or merger or consolidation under this section whose effect in any section of the country may be substantially to lessen competition, or to tend to create a monopoly, or which in

The threshold question before us is whether this final sentence authorizes the Board to disapprove a transaction on grounds of financial unsoundness in the absence of any anticompetitive impact. If so, we must decide whether the Board can only exercise that authority when the transaction would cause or exacerbate the financial unsoundness of the holding company or a subsidiary bank.

## I

The First National Bank of Lincolnwood, Ill., is controlled by four individuals who hold 86% of its stock in a voting trust. These individuals organized respondent, the First Lincolnwood Corp., to serve as a bank holding company. They planned to exchange their shares in the bank for shares of respondent and, in addition, to have respondent assume a $3.7 million debt they had incurred in acquiring control of the bank.[3] Respondent intended to use the dividends it would receive on the bank's shares to retire this debt over a 12-year period. Further, in order to augment the bank's capital,

---

any other manner would be in restraint or [sic] trade, unless it finds that the anticompetitive effects of the proposed transaction are clearly outweighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the community to be served.

"In every case, the Board shall take into consideration the financial and managerial resources and future prospects of the company or companies and the banks concerned, and the convenience and needs of the community to be served." 70 Stat. 135, as amended, 80 Stat. 237, 12 U. S. C. § 1842 (c).

[3] The four individuals incurred part of this $3.7 million debt in order to buy out the shares of a former chairman and president of the bank, who had been indicted for securities fraud. See 546 F. 2d 718, 723–724, n. 1 (CA7 1976) (Fairchild, C. J., dissenting from the panel opinion). The entire $3.7 million debt was secured by the bank stock they had acquired in this and previous transactions. While the proposed transaction with respondent would relieve the individual shareholders of their primary obligations under the loans, these shareholders would remain secondarily liable if respondent defaulted and its obligations exceeded the value of the bank's stock. See App. 24, 29–30, 42, 55–56.

238

respondent would issue $1.5 million in capital notes and then use the proceeds to purchase new shares issued by the bank. The purpose of restructuring ownership interests in this fashion was to enable the holding company and the bank to file a consolidated tax return and thereby realize substantial tax savings.[4]

Because under the proposed transaction respondent would become a bank holding company, § 3 (a) of the Act required that the proposal be submitted for the Board's approval. See n. 1, *supra*. Respondent filed its application with the Federal Reserve Bank of Chicago, as specified by Board regulations.[5]

---

[4] The Internal Revenue Code of 1954, 26 U. S. C. § 1501, permits an affiliated group of corporations to file a consolidated income tax return. Respondent and the bank would be affiliated by virtue of respondent's ownership of at least 80% of the bank's stock. 26 U. S. C. § 1504. Filing a consolidated return would permit the group to deduct the interest on the $3.7 million debt from the bank's gross income when determining the taxable income of the consolidated entity. 26 CFR § 1.1502–11 (a) (1) (1977); 26 U. S. C. § 163. The tax savings from this deduction could then be transferred to respondent as a tax-free intercorporate dividend and used to retire the acquisition debt. 26 CFR § 1.1501–14 (a) (1) (1977). Although in the absence of this transaction, the individual shareholders presumably can deduct from personal income their interest payments on the debt, see 26 U. S. C. § 163, respondent contends that approval of the transaction would have saved the bank and holding company approximately $142,000 in taxes in the first year alone. Brief for Respondent 5–6, n. 2. These tax savings would have diminished as interest payments on the outstanding debt declined.

[5] A company seeking to acquire a bank must submit an application to the Federal Reserve bank of the district in which the applicant is located. 12 CFR §§ 225.3 (a)–(b), 262.3 (b) (1978). The Reserve bank evaluates the application against the Board's standards and makes a recommendation to the Board. § 262.3 (c). At the "appropriate" time, the Reserve bank forwards the application to the Board so that the Board staff can undertake an independent evaluation. *Ibid.*

After the application is forwarded, the Board must notify the Comptroller of the Currency if a national bank is involved, or state supervisory authorities if a state bank is involved, and in most cases must allow the agency 30 days to submit a recommendation. 12 U. S. C. § 1842 (b). See

The Chicago Reserve Bank concluded that the Lincolnwood bank's capital position—in essence, the difference between its assets and its liabilities—was inadequate and, under respondent's proposal, was unlikely to improve enough to attain the minimum level the Board had determined necessary to protect the bank's depositors.[6]  Nonetheless, the Lincolnwood bank's favorable earnings prospects and strong management led the Chicago Reserve Bank to recommend that the transaction be approved.  The Comptroller of the Currency, however, independently reviewed respondent's application and concluded that it should be denied unless the bank's capital position was strengthened.

---

n. 12, *infra*.  If the Comptroller or state supervisory authority recommends that the application be denied, the Board must notify the applicant and conduct a hearing.  12 U. S. C. § 1842 (b).  On the other hand, if the Comptroller or state authority recommends approval of the transaction or declines to submit a timely recommendation, several Courts of Appeals have held that the Board need not provide a hearing before making its decision, see, *e. g.*, *Kirsch* v. *Board of Governors*, 353 F. 2d 353, 356 (CA6 1965); *Northwest Bancorporation* v. *Board of Governors*, 303 F. 2d 832, 842–844 (CA8 1962), though it may choose to provide one.  See 12 CFR §§ 262.3 (g)(2), (3) (1978).  In neither case is the Board bound by the recommendation of these agencies.  See *Whitney Nat. Bank* v. *Bank of New Orleans*, 379 U. S. 411, 419–420, 423 (1965).  For a more complete explication of the Board's procedures, see P. Heller, Handbook of Federal Bank Holding Company Law 317–363 (1976).

[6] The Board uses several measures of capital adequacy.  One is the ratio of equity capital to total liabilities less cash on hand, known as the invested-asset ratio.  Another is the ratio of total capital (debt and equity) to total assets, known as the capital-asset ratio.  See Heller, *supra* n. 5, at 131–132; Clark, The Soundness of Financial Intermediaries, 86 Yale L. J. 1, 63 (1976).  The Board regards an invested-asset ratio of 9%, see App. 52–53 (Board staff memorandum), and a capital-asset ratio of 8%, see Hearing on Problem Banks before the Senate Committee on Banking, Housing, and Urban Affairs, 94th Cong., 2d Sess., 137 (1976), as the minimal levels of capital necessary to maintain financial soundness.  Respondent has not specifically challenged the validity of these standards as measures of bank safety.

Respondent thereupon modified its proposal to accommodate the Comptroller's objections. Instead of issuing $1.5 million in capital notes and using the proceeds to purchase new bank stock, respondent proposed that the bank itself sell $1 million in long-term capital notes and $1.1 million in new common stock. In addition, respondent proposed a substantial reduction in the dividends to be paid on the bank stock. Upon review of the modified proposal, the Chicago Reserve Bank adhered to its original recommendation, finding the modification salutary insofar as it increased the total addition to the bank's capital, though "slightly unfavorable" insofar as it decreased the addition to the bank's equity capital from $1.5 to $1.1 million.[7] The Comptroller considered the revised plan superior to the original proposal; therefore, he, too, recommended approval.

The Board staff independently evaluated the application and determined that the bank's projected capital position would fall below the Board's requirements.[8] The staff also found that respondent had not established its ability to raise the additional capital without the individual shareholders'

---

[7] While the Board considers capital notes that are subordinated to depositors' demands to be part of a bank's overall capital, it regards them as a less desirable financial cushion than equity. See Heller, *supra* n. 5, at 130–131, n. 209; see, *e. g., Clayton Bancshares Corp.,* 50 Fed. Res. Bull. 1261, 1264 (1964); *Mid-Continent Bancorporation,* 52 Fed. Res. Bull. 198, 200 (1966).

[8] The bank's invested-asset ratio was 5.3% in 1975. The Board staff estimated that an infusion of $2.5 million in equity capital would be necessary to bring the bank up to the Board's minimum standard of 9%. The respondent's proposed addition of $1.1 million in equity and $1 million in debt would have raised the bank's invested-asset ratio to only 6.8%, $1.5 million short of the minimum 9%. The additional $2.1 million in total capital would have raised the bank's capital-asset ratio for 1975 from 5.2% to 7.4%. However, amortization of the $3.7 million acquisition debt and the $1 million in capital notes would have caused the ratio to dwindle to 5.2% by 1987, well short of the Board's 8% minimum. App. 52–54.

incurring more debt. Although acknowledging that the bank's management was capable, the staff concluded that

> "it would appear desirable that Bank's overall capital position should be materially improved and that financing arrangements for the proposed capital injections into Bank [should] be made more definite." App. 54–55.

The Board concurred. It reviewed each of the elements enumerated in § 3 (c), determining first that the proposal had no anticompetitive impact because the transaction merely transferred control of the bank "from individuals to a corporation owned by the same individuals." *First Lincolnwood Corp.*, 62 Fed. Res. Bull. 153 (1976). Similarly, the Board found that the proposal would effect no significant changes in the services offered by the bank to customers, so factors relating to the convenience and needs of the community militated neither for nor against approval. *Id.*, at 154. Thus, the financial and managerial considerations specified in the final sentence of § 3 (c) were dispositive of respondent's application.

Addressing these considerations, the Board ruled that a bank holding company "should provide a source of financial and managerial strength to its subsidiary bank(s)." 62 Fed. Res. Bull., at 153. Here, the Board found, even if the bank's optimistic earnings projections were realized, respondent would lack the financial flexibility necessary both to service its debt and to maintain adequate capital at the bank. This, as well as the uncertainty regarding the proposed source of the capital injections, raised serious doubts as to respondent's financial ability to resolve unforeseen problems that could arise at the bank. The Board therefore concluded that

> "it would not be in the public interest to approve the formation of a bank holding company with an initial debt structure that could result in the weakening of Bank's overall financial condition." *Id.*, at 154.

A divided panel of the Court of Appeals for the Seventh Circuit affirmed, the majority finding substantial evidence to

support the denial of respondent's application. 546 F. 2d 718, 720–721 (1976).[9] On rehearing en banc, the court unanimously set aside the Board's order. The court recognized that Congress had empowered the Board "to deny approval of a bank acquisition upon finding it not to be in the public interest for reasons other than an anticompetitive tendency." 560 F. 2d 258, 261 (1977). However, in the court's view, § 3 (c) of the Act did not permit the Board to withhold approval because of financial or managerial deficiencies unless those deficiencies were "caused or enhanced by the proposed transaction." 560 F. 2d, at 262. This transaction, the court observed, merely reshuffled ownership interests in the bank. Apart from the proposed addition to capital and the tax advantage, which could accelerate reduction of the $3.7 million debt, respondent's proposal was without financial consequence. The court therefore held that the Board had overstepped its authority under § 3 (c) in denying respondent's application. 560 F. 2d, at 262–263.

We granted certiorari because of the impact of this holding on the Board's ability to fulfill its regulatory responsibilities under the Bank Holding Company Act. 434 U. S. 1061 (1978). We conclude that the court below improperly restricted the Board's authority, and, accordingly, we reverse.

## II

Respondent contends that the Court of Appeals misinterpreted the legislative history of the Bank Holding Company Act in sustaining the Board's authority to deny applications for holding-company status solely on grounds of financial or managerial unsoundness. As respondent reads the legislative history, Congress' only concern in passing the Act was with the anticompetitive potential in the concentration of banking resources and the combination of banking and nonbanking

---

[9] The Court of Appeals had jurisdiction to review the Board's order pursuant to 12 U. S. C. § 1848.

enterprises. See S. Rep. No. 1095, 84th Cong., 1st Sess., 2 (1955); S. Rep. No. 1179, 89th Cong., 2d Sess., 2 (1966). This focus on competitive considerations was reflected in the amendment of the Act in 1966 to conform § 3 (c) with the standards enunciated in the Bank Merger Act amendments of the same year. See 80 Stat. 8, 12 U. S. C. § 1828 (c)(5). The amended standards in the Bank Merger Act were intended to provide an exception to the antitrust laws for those bank mergers in which the benefits to the community outweighed the anticompetitive impact. See *United States* v. *Third Nat. Bank,* 390 U. S. 171 (1968). By incorporating these same standards into the Bank Holding Company Act, respondent infers, Congress intended to authorize the Board to consider financial and managerial resources only as counter-weights to a transaction's anticompetitive impact. We do not agree that the Board's authority under the Bank Holding Company Act is so limited.

The language of the statute supports the Board's interpretation of § 3 (c) as an authorization to deny applications on grounds of financial and managerial unsoundness even in the absence of any anticompetitive impact. Section 3 (c) directs the Board to consider the financial and managerial resources and future prospects of the applicants and banks concerned "[i]n every case," not just in cases in which the Board finds that the transaction will have an anticompetitive effect.

Moreover, the Board's interpretation of § 3 (c) draws support from the legislative history. Section 19 of the original version of the Banking Act of 1933, 48 Stat. 186, authorized the Board to regulate the financial and managerial soundness of bank holding companies and their banking subsidiaries. Holding companies were required to obtain a permit from the Board before voting the shares of a national bank. Section 19 directed the Board to consider, in acting upon an application for a voting permit, the financial condition of the company and the general character of its management. 48 Stat. 186. In addition, an applicant had to submit to

financial examination by the Board and to maintain a prescribed reserve of liquid assets. 48 Stat. 187. However, the voting-permit provisions applied only if the bank was a member of the Federal Reserve System and the holding company sought to exercise control by actually voting the bank shares. Because of this limitation, § 19 ultimately proved of little value in ensuring the financial responsibility of bank holding companies and their subsidiaries. See H. R. Rep. No. 609, 84th Cong., 1st Sess., 4–5 (1955).

To ameliorate this deficiency, Congress expanded the Board's authority by enacting the Bank Holding Company Act of 1956. Section 3 (c) of the Act enumerated five factors for the Board to consider whenever a company sought to acquire control of a bank:

> "(1) the financial history and condition of the company or companies and the banks concerned; (2) their prospects; (3) the character of their management; (4) the convenience, needs, and welfare of the communities and the area concerned; and (5) whether or not the effect of such acquisition or merger or consolidation would be to expand the size or extent of the bank holding company system involved beyond limits consistent with adequate and sound banking, the public interest, and the preservation of competition in the field of banking." 70 Stat. 135.

The House Report on the Act noted the similarity between these factors and those specified in other banking statutes as the basis for admitting state banks to membership in the Federal Reserve System and for granting federal deposit-insurance coverage. H. R. Rep. No. 609, *supra,* at 15. In both instances, the adequacy of the bank's capital is an important factor to be considered by the reviewing agency. See 12 U. S. C. §§ 329, 1816.[10]

---

[10] Section 329 provides that no state bank may be admitted to membership in the Federal Reserve System unless "it possesses capital stock and surplus which, in the judgment of the Board of Governors of the Federal

In amending § 3 (c) to conform to the language of the Bank Merger Act in 1966, see *supra,* at 243, Congress did not intend to confine the Board's consideration of financial and managerial soundness only to transactions that would have an anticompetitive impact. The sole reason given for the change was "the interests of uniform standards" in regulating both mergers and acquisitions in the banking industry. S. Rep. No. 1179, *supra,* at 9. Regardless of whether Congress intended to limit the inquiry under the Bank Merger Act,[11] there

---

Reserve System, are adequate in relation to the character and condition of its assets and to its existing and prospective deposit liabilities and other corporate responsibilities." 38 Stat. 258, as amended, 12 U. S. C. § 329.

Section 1816 enumerates the factors to be considered in the determination whether to grant a bank federal deposit insurance coverage:

"The financial history and condition of the bank, the adequacy of its capital structure, its future earnings prospects, the general character of its management, the convenience and needs of the community to be served by the bank, and whether or not its corporate powers are consistent with the purposes of this Act." 64 Stat. 876, 12 U. S. C. § 1816.

[11] Respondent's argument that Congress circumscribed the role of banking factors in the Board's inquiry under § 3 by borrowing the language of the Bank Merger Act assumes that supervisory agencies applying that Act can consider such factors only as they bear upon competitive considerations. This assumption may be unwarranted.

The House Report on the 1966 amendments to the Bank Merger Act is somewhat ambiguous regarding the weight that may be assigned to financial and managerial factors, but it does not appear to preclude consideration of those factors as independent bases for disapproval of a merger:

"Of course, the expression of these factors in the statute would not preclude the banking agencies, charged as they are with general supervisory responsibility, from considering in any particular case such other factors as they might deem relevant. However, only the convenience and needs of the community to be served can be weighed against anticompetitive effects, with financial and managerial resources being considered only as they throw light on the capacity of the existing and proposed institutions

is no indication that it intended to incorporate that limitation into the Bank Holding Company Act. Indeed, in 1966 Congress repealed the voting-permit provisions of the 1933 Act, which had been left intact in 1956, because it believed that the Board retained authority under § 3 (c), even as amended, to ensure the financial and managerial soundness of holding companies and their subsidiary banks. The Senate Committee on Banking and Currency stated:

> "Since the Bank Holding Company Act makes it necessary for any bank holding company to obtain the Board's prior approval before acquiring the stock of any bank (whether member or nonmember) and since, in granting

to serve the community." H. R. Rep. No. 1221, 89th Cong., 2d Sess., 4 (1966).

This language speaks only to the role of financial and managerial factors in determining under 12 U. S. C. § 1828 (c)(5)(B) whether the anticompetitive effects of a merger outweigh its benefits to the community. In this specific determination, financial and managerial resources are relevant only as they affect the assessment of those benefits. But the House Report says nothing about a situation where, as here, the merger has *no* anticompetitive impact. This situation was addressed by Senator Robertson, Chairman of the Senate Committee on Banking and Currency, which was responsible for the Bank Merger Act amendments:

"Of course, if there are no substantial anticompetitive effects and no tendency to create a monopoly and no suggestion of restraint of trade, the banking agency will proceed to consider the merger on the basis of the financial and managerial resources and future prospects of the existing and proposed institutions and the convenience and needs of the community to be served. The banking agency may approve the merger if it thinks the merger will be beneficial from these points of view, or it can turn the merger down if it thinks the merger undesirable or objectionable in any respects from these points of view." 112 Cong. Rec. 2656 (1966) (prepared statement).

See also *id.*, at 2457, 2460 ("[S]upervisory agencies must use the banking factors to evaluate whether or not a merger will result in a solvent and viable institution, and . . . they should not allow a merger unless this prerequisite is met") (Rep. Todd).

that approval, the Board must consider the financial condition and management of the holding company, the voting permit procedure . . . serves no substantial purpose." S. Rep. No. 1179, *supra*, at 12.

In 1970, Congress amended the Bank Holding Company Act to extend its coverage to holding companies that controlled only one bank. 84 Stat. 1760, 12 U. S. C. § 1841 (a). Previously, the Act had applied only to multibank holding companies. The principal purpose of this change was to prevent one-bank holding companies from entering businesses not related to banking. S. Rep. No. 91–1084, pp. 2–4 (1970). Nothing in the legislative history of the 1970 amendments suggests that in extending the Act, Congress intended to depart from its prior understanding of the Board's authority or to establish a different rule for one-bank holding companies.[12]

---

[12] Congress has amended the Bank Holding Company Act twice since 1970, but those amendments do not affect the disposition of this case. In 1977, Congress made essentially technical refinements in the Bank Holding Company Act. These amendments permit the Board to extend further the time for a bank or a bank holding company to divest itself of bank stock acquired in the course of collecting or securing a debt. The amendments also empower the Board to dispense with the requirement that the Comptroller or state authority be given 30 days' notice before the Board acts on an application, if more rapid action is necessary to prevent the failure of the bank to be acquired. §§ 301, 302, 91 Stat. 1388–1390, amending 12 U. S. C. §§ 1842 (a), (b). See H. R. Rep. No. 95–774, pp. 7–8 (1977).

In 1978, Congress strengthened the Board's regulatory powers principally by permitting the assessment of civil penalties for certain violations of the Bank Holding Company Act. § 106, 92 Stat. 3647, amending 12 U. S. C. § 1847. The 1978 amendments also authorize the Board to require a holding company to divest itself of nonbank subsidiaries whenever necessary to avoid "serious risk to the financial safety, soundness, or stability of a bank holding company subsidiary bank" or to be consistent with sound banking principles. § 105, amending 12 U. S. C. § 1844. These amendments, in particular, reflect Congress' intent to vest the Board with authority to ensure the financial soundness of bank holding companies and

Our conclusion as to the scope of the Board's authority is bolstered by reference to the principle that an agency's long-standing construction of its statutory mandate is entitled to great respect, "especially when Congress has refused to alter the administrative construction." *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367, 381 (1969); *Zemel* v. *Rusk*, 381 U. S. 1, 11–12 (1965); *Udall* v. *Tallman*, 380 U. S. 1, 16 (1965). The Board has regularly treated deficiencies in the financial and managerial resources of holding companies and their banking subsidiaries as sufficient grounds for denying an application. *Clayton Bancshares Corp.*, 50 Fed. Res. Bull. 1261, 1264–1265 (1964); *Mid-Continent Bancorporation*, 52 Fed. Res. Bull. 198, 200–201 (1966); *Midwest Bancorporation, Inc.*, 56 Fed. Res. Bull. 948, 950 (1970); *Citizens Bancorp*, 61 Fed. Res. Bull. 806 (1975); *Bankshares of Hawley, Inc.*, 62 Fed. Res. Bull. 610 (1976); see 12 CFR § 265.2 (f)(22)(vii) (1978). Moreover, Congress has been made aware of this practice,[13] yet four times has "revisited the Act and left the practice untouched." *Saxbe* v. *Bustos*, 419 U. S. 65, 74 (1974). See 80 Stat. 236; 84 Stat. 1760; 91 Stat. 1388; 92 Stat. 3641.[14] We therefore agree with the Court of Appeals that the Board can disapprove formation of a bank holding company solely on grounds of financial or managerial unsoundness.

---

their subsidiaries, a purpose entirely consonant with our interpretation of the Board's authority under § 3 (c).

[13] See Senate Committee on Banking, Housing, and Urban Affairs, Compendium of Major Issues in Bank Regulation, 94th Cong., 1st Sess., 379, 411 (Comm. Print 1975); Hearings on Financial Institutions and the Nation's Economy before the Subcommittee on Financial Institutions Supervision, Regulation and Insurance of the House Committee on Banking, Currency, and Housing, 94th Cong., 1st and 2d Sess., pt. 3, p. 2403 (1976); Hearings on the Safe Banking Act of 1977 before the Subcommittee on Financial Institutions Supervision, Regulation and Insurance of the House Committee on Banking, Finance and Urban Affairs, 95th Cong., 1st Sess., pt. 3, pp. 1321, 1439 (1977).

[14] See n. 12, *supra*.

## III

While the Court of Appeals recognized the Board's authority to treat financial or managerial unsoundness as a dispositive consideration, it held that this authority was limited to instances in which the unsoundness was caused or exacerbated by the proposed transaction.[15] The Court of Appeals rejected the Board's argument that permission to form a holding company is "a reward which it may withhold until the applicant's financial status fulfills the Board's standard of desirability." 560 F. 2d, at 262. The legislative history, the court held, revealed nothing that would allow the Board to disapprove formation of a bank holding company where the transaction would not weaken a subsidiary bank's financial condition. In addition, the already extensive regulation of the financial integrity of banks by the Comptroller of the Currency and state regulatory agencies persuaded the court that Congress could not have intended to extend identical authority to the Federal Reserve Board. *Id.,* at 262–263.

We perceive no basis for the limitation the Court of Appeals imposed. Certainly, it is not compelled by the language of the statute. By its terms, § 3 (c) requires the Board to consider financial and managerial factors in "every case." Just as we observed earlier that this language encompasses cases in which the proposed transaction would have no anti-competitive effect, *supra,* at 243, so, too, it encompasses cases in which the transaction would not weaken the bank or the

---

[15] The Board contends that the transaction would in fact weaken the capital position of the bank. Reply Brief for Petitioner 2 n. 2. The Court of Appeals found otherwise, relying on the Board's concession during oral argument before the original panel that operation of the bank through a holding company "might in fact be financially sounder" as a result of the tax advantage. 560 F. 2d, at 263 n. 3. Because we conclude that the Board had authority to deny respondent's application regardless of whether the transaction would weaken the bank's capital position, we need express no opinion on this dispute.

bank holding company. Indeed, the Court of Appeals' construction of the statute would require the Board to approve formation of a bank holding company with corrupt management simply because management would become no more corrupt by virtue of the transaction. We hesitate to adopt a construction that would yield such an anomalous result.

Furthermore, the legislative record does provide support for the Board's actions. In deliberations on the Bank Holding Company Act, see, e. g., H. R. Rep. No. 609, 84th Cong., 1st Sess., 4–5 (1955); H. R. Rep. No. 95–1383, p. 19 (1978), and in subsequent inquiries into banking regulation, see, e. g., Hearing on Problem Banks, supra, n. 6; Hearings on the Safe Banking Act of 1977, pts. 1–4, supra, n. 13, Congress has evinced substantial concern for the financial soundess of the banking system. And Congress has long regarded capital adequacy as a measure of bank safety. See, e. g., 12 U. S. C. § 329 (Federal Reserve Act), § 1816 (Federal Deposit Insurance Act); S. Rep. No. 133, 63d Cong., 1st Sess., pt. 2, p. 11 (1913); S. Rep. No. 1623, 82d Cong., 2d Sess., 2 (1952). To rule that the Board could not require applicants for holding-company status and their subsidiary banks to meet minimum capital-adequacy requirements would be inconsistent with this general legislative mandate.

Nor can we accept the conclusion that Congress intended to reserve questions of bank safety to the Comptroller or state agencies except where a transaction would harm the financial condition of an applicant or the bank. The history of the Bank Holding Company Act nowhere suggests that Congress sought to delineate such a jurisdictional boundary. Indeed, our decision in *Whitney Nat. Bank* v. *Bank of New Orleans,* 379 U. S. 411 (1965), indicates that the Board's jurisdiction is paramount. We ruled there that the Comptroller could not deny a new bank a license to do business—a decision normally within his competence, see 12 U. S. C. §§ 26, 27—once the Board approved a bank holding company transac-

tion that entailed formation of the new bank. 379 U. S., at 419, 423. It follows that the Federal Reserve Board's actions here are not invalid merely because the powers exercised duplicate those of other regulators.

Again, our conclusion is influenced by the principle that courts should defer to an agency's construction of its own statutory mandate, *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S., at 381; *Commissioner* v. *Sternberger's Estate,* 348 U. S. 187, 199 (1955), particularly when that construction accords with well-established congressional goals. The Board has frequently reiterated that holding companies should be a source of strength to subsidiary financial institutions. See, *e. g., Northern States Financial Corp.,* 58 Fed. Res. Bull. 827, 828 (1972); *Citizens Bancorp,* 61 Fed. Res. Bull. 806 (1975); *Downs Bancshares, Inc.,* 61 Fed. Res. Bull. 673 (1975). It has used the substantial advantages of bank holding-company status to induce applicants to improve their own and their subsidiaries' capital positions. See P. Heller, Handbook of Federal Bank Holding Company Law 127, and n. 195 (1976); The Bank Holding Company—1973, pp. 35, 83 (R. Johnson ed. 1973).[16] In fact, between 1970 and 1975, the Board convinced 397 applicants to provide additional capital totaling $788 million and indirectly prompted the infusion of even more capital. Hearings on Financial Institutions and the Nation's Economy, *supra* n. 13, at 2403 (testimony of Philip Coldwell, member of the Board of Governors of the Federal Reserve System). Congress has been apprised of this consistent

---

[16] Among these advantages are a bank holding company's ability to expand into banking-related activities with the Board's approval, 12 U. S. C. § 1843 (c)(8), to avoid some state-law restrictions against branch banking, see *Whitney Nat. Bank* v. *Bank of New Orleans,* 379 U. S., at 413, and to realize substantial tax savings. See n. 4, *supra.* Given the applicable state law, Ill. Const., Art. 13, § 8; Ill. Rev. Stat., ch. 16½, § 106 (1975), and the nature of respondent's proposed transaction, only the last of these advantages afforded the Board leverage in this case.

administrative practice, *ibid.;* Compendium of Major Issues in Bank Regulation, *supra* n. 13, at 379, and has not undertaken to change it. Indeed, a Report of the Senate Committee on Banking, Housing, and Urban Affairs in 1977 echoed the exact language of the Board's standard. S. Rep. No. 95–323, p. 11 ("Holding companies are supposed to be a source of strength to subsidiary financial institutions").[17]

We hold that the Board may deny applications for holding-company status solely on grounds of financial or managerial unsoundness, regardless of whether that unsoundness would be caused or exacerbated by the proposed transaction.[18]

## IV

Respondent contends that the Board's denial of its application was arbitrary and capricious. We have already determined that the Board's "source of strength" requirement

---

[17] The Senate Report accompanied the Financial Institutions Supervisory Act Amendments of 1977, S. 71, 95th Cong., 1st Sess. (1977). These amendments were passed by the Senate but were not brought before the House. In the next session, Congress enacted a subsequent version of these amendments as the Financial Institutions Regulatory and Interest Rate Control Act of 1978, *supra,* n. 12.

[18] The dissent argues that because the proposed transaction would not exacerbate the financial difficulties of the bank, the Board's disapproval rests not on the *effects* of the transaction, but on "pre-existing or unrelated conditions." *Post,* at 255. In the dissent's view, the Board, by looking beyond the transaction before it, attempted to exercise the day-to-day regulatory authority over banks which Congress denied to it and conferred on the Comptroller. We disagree with the basic premise of the dissent's argument. As the Board found, the *effect* of this transaction would have been the formation of a financially unsound bank holding company. Thus, the Board's attempt to prevent this effect and to induce respondent to form an enterprise that met the Board's standards of financial soundness was entirely consistent with the language the dissent cites. Moreover, congressional concern with financial soundness and capital adequacy is by no means "irrelevant," *post,* at 257, to whether the Board's attempt exceeded its authority.

is consistent with the language, purpose, and legislative history of the Bank Holding Company Act. Our only remaining inquiry is whether substantial evidence supports the Board's finding that respondent fell short of this standard. 12 U. S. C. § 1848.[19]

The Court of Appeals panel had "no difficulty" in finding substantial evidence to sustain the Board's decision, 546 F. 2d, at 720, and respondent did not press this issue in its petition for rehearing en banc. We, too, find in this record more than the amount of evidence "a reasonable mind might accept as adequate to support [the Board's] conclusion." *Consolidated Edison Co.* v. *NLRB,* 305 U. S. 197, 229 (1938); accord, *Richardson* v. *Perales,* 402 U. S. 389, 401 (1971); *Consolo* v. *FMC,* 383 U. S. 607, 619–620 (1966). The application failed to establish that respondent could raise the $2.1 million in additional capital in the manner proposed. Moreover, it revealed that even with this infusion, the bank's capital would have been well below the level the Board had determined necessary to sustain the financial soundness of the enterprise. Thus, the Board was entitled to conclude that respondent would not be a sufficient source of financial and managerial strength to its subsidiary bank. Having so determined, the Board was entitled to deny the application.[20]

---

[19] Section 9 of the Bank Holding Company Act, 70 Stat. 138, as amended, 12 U. S. C. § 1848, provides that "[t]he findings of the Board as to the facts, if supported by substantial evidence, shall be conclusive."

[20] We also find substantial evidence to sustain the Board's determination that considerations involving the convenience and needs of the community do not support respondent's application. Indeed, the Board previously has recognized the connection between the needs of the community and the financial well-being of a bank, holding that an applicant's financial inability to resolve unforeseen problems could "impair [the bank's] overall ability to continue to serve the community as a viable banking organization." *Citizens Bancorp,* 61 Fed. Res. Bull. 806 (1975); accord, *Downs Bancshares, Inc.,* 61 Fed. Res. Bull. 673, 674 (1975).

We hold that the Board's actions were within the authority conferred by Congress and were supported by substantial evidence. Consequently, the judgment is

*Reversed.*

MR. JUSTICE STEVENS, with whom MR. JUSTICE REHNQUIST joins, dissenting.

This case involves a proposal to restructure the ownership of a relatively small bank in order to reduce its income taxes. From the standpoint of the bank's competitors, its creditors, its owners, and its customers, as well as the public at large, the proposed transaction is at worst completely harmless, and at best substantially beneficial.

The Federal Reserve Board nevertheless refused to approve the transaction, not because of any concern about adverse effects of the transaction itself, but rather to induce the owners of the bank to take action that the Board has no authority to require of bank owners generally. In the Board's view, its approval power is a sort of lever that it may use to bend the will of independent bank owners and managers. I share the opinion expressed by Chief Judge Fairchild for the unanimous Court of Appeals for the Seventh Circuit sitting en banc that the application of this kind of leverage has not been authorized by Congress.[1]

The normal reason for subjecting any type of transaction to advance administrative approval is a concern about the possible consequences of the transaction itself. I can think of no judicial precedent or statutory analog authorizing an agency to use approvals as an all-purpose tool to accomplish objects entirely unrelated to the approved transaction. Before concluding that Congress intended to pass such an unprecedented

---

[1] "The Board assumes the stance that the tax advantage of bank holding company status is a reward which it may withhold until the applicant's financial status fulfills the Board's standard of desirability. We do not find this power or breadth of discretion in the statute." 560 F. 2d 258, 262 (1977) (en banc).

approval statute, therefore, I would insist upon a clear expression of that intent from Congress itself. Because the language, structure, and legislative history of § 3 (c) of the Bank Holding Company Act of 1956, 12 U. S. C. § 1842 (c), belie any such intent, I cannot accept the Board's interpretation.

Read in its entirety, the language of § 3 (c) confines the Board's authority to the evaluation of the *effects* of proposed holding company transactions.[2] Specifically, the statute commands the Board to disapprove any acquisition "which would *result* in a monopoly," or "whose *effect*" may be substantially to lessen competition, unless it finds that the "anticompetitive *effects*" are outweighed "by the probable *effect* of the transaction in meeting the convenience and needs of the community." Although the last sentence in § 3 (c) does not also explicitly limit the Board's consideration to the financial and managerial "effects" of the proposed reorganization, when read in context its reference to "future prospects" surely reflects the same concern for the consequences of the transaction rather than pre-existing or unrelated conditions.[3]

---

[2] Section 3 (c) is quoted in the opinion of the Court, *ante*, at 236–237, n. 2.

[3] It is not disputed that the last sentence in § 3 (c) serves in part to explain the Board's duty to analyze a transaction's "probable *effect*" on the "convenience and needs of the community" and then to weigh those effects against any anticompetitive "*result*[*s*]" of the transaction. Because the statute so clearly limits the Board's consideration to effects in that endeavor, it makes little sense to read the same sentence to give the Board broader authority in analyzing the financial and managerial aspects of the transaction apart from its anticompetitive results.

The Board's position is especially untenable in that the two principal concerns reflected in § 3 (c) are concentration of commercial banking facilities under a single management and the combination under single control of banking and nonbanking enterprises. These concerns, neither of which is even remotely implicated by this transaction, were described in the testimony of Chairman Martin on behalf of the Board in 1955. He thought legislation was necessary because of:

"(1) The unrestricted ability of a bank holding company group to add to the number of its banking units, making possible the concentration of com-

The overall structure of the federal banking laws lends credence to this interpretation. It is not the Board but instead the Comptroller of the Currency that has day-to-day regulatory jurisdiction over existing financial and managerial conditions at national banks such as the one involved here.[4] If the Board can employ its holding-company approval power as a lever for inducing banks to achieve more satisfactory financing, management, future prospects, and community service, it can indirectly exercise authority that Congress has denied it and given directly to another agency.[5]

---

mercial bank facilities in a particular area under a single control and management; and

"(2) The combination under single control of both banking and nonbanking enterprises, permitting departure from the principle that banking institutions should not engage in business wholly unrelated to banking. Such a combination involves the lending of depositors' money, whereas other types of business enterprise, not connected with banking, do not involve this element of trusteeship." S. Rep. No. 1095, 84th Cong., 1st Sess., 2 (1955).

In the Board's anomalous view, therefore, Congress has carefully confined the agency's power to carry out the two primary purposes of the legislation, while leaving it with virtually unbounded authority to effectuate the statute's secondary goal of assuring financial and managerial stability in bank holding companies.

[4] Although the Board decides which banks qualify for membership in the Federal Reserve System, 12 U. S. C. § 329, its day-to-day regulatory authority extends only to *state* member banks that are insured by the Federal Deposit Insurance Corporation. National member banks, such as respondent, are subject to the daily control of the Comptroller of the Currency. 12 U. S. C. §§ 1813 (b), (d), (h), 1818.

[5] To use the Court's example, *ante*, at 250, if the Board is concerned with possible corruption in a national bank's management, it may not address that problem directly by way of a cease-and-desist order or other remedies. That power resides exclusively in the Comptroller. See n. 4, *supra*. The Board nonetheless claims the power to require a change in management before the bank can earn a reward in the form of tax savings available through holding-company ownership—even when it concludes that the change in ownership form would in no way enhance the dangers of corrupt management and would only improve the bank's overall situation. Having

The sparse legislative history cited by the Court on this point, *ante,* at 250, is of no help to the Board's position. It is true that Congress has been concerned with the "financial soundness" and "capital adequacy" of banks controlled by holding companies. But that concern is simply irrelevant to the issue whether Congress intended the Board to deny holding-company approval that would not adversely affect, but rather would enhance, the bank's financial soundness and capital adequacy.

The authority claimed by the Board is also illogical. If certain capital ratios are essential for sound banking operations, and if the Comptroller is unable to achieve them, then the Board should be given power to require them by a general rule or standard applicable to all banks. Haphazard enforcement against only those banks that seek approval of holding company status is a most unusual and disorderly way to administer any significant policy.

In the end, the Court's decision rests entirely on "the principle that courts should defer" to the administrative agency's own interpretation of its statutory authority. *Ante,* at 251. The Court assumes that the Board's asserted authority originated with the passage of the Bank Holding Company Act of 1956. *Ante,* at 244. Not until eight years later, however, did the Board purport to exercise that authority, and it did so without explaining the statutory basis for its actions. *Clayton Bancshares Corp.,* 50 Fed. Res. Bull. 1261, 1264–1265 (1964); see opinion of the Court, *ante,* at 248. Such a belated and casual assertion of power by the Board, no matter how long it has persisted, hardly qualifies as the type of administrative policy that may stand in place of an expression of legislative intent. See *SEC* v. *Sloan,* 436 U. S. 103 (overturning as beyond the authority of the SEC a policy followed by that agency for 34 years). See also *Adamo*

---

withheld the former power, I think it is illogical to assume without any proof at all that Congress intended to grant the latter.

*Wrecking Co.* v. *United States,* 434 U. S. 275, 287–289, and n. 5. I would not allow this agency, no matter how well respected and how well motivated, to construe vague statutory language as conferring such wide-ranging power on itself. Like Chief Judge Fairchild and his colleagues, I "do not find this power or breadth of discretion in the statute." 560 F. 2d 258, 262 (CA7 1977).[6]

I respectfully dissent.

---

[6] In the text of its opinion the Court states its intention to "decide whether the Board can only exercise [its approval] authority when the transaction would cause or exacerbate the financial unsoundness of the holding company or a subsidiary bank." *Ante,* at 237. Later the Court purports to "hold that the Board may deny applications for holding-company status solely on grounds of financial or managerial unsoundness, regardless of whether that unsoundness would be caused or exacerbated by the proposed transaction." *Ante,* at 252. What purports to be a broad holding, however, is significantly qualified by n. 18 which was added in response to this dissent. In that footnote the Court limits its holding to a case in which the effect of the transaction is the formation of a financially unsound bank holding company. So limited, this case involves nothing more than a dispute over whether this particular holding company was financially unsound—a dispute that hardly merits this Court's attention. Even on this narrow ground of decision, however, I find the Court's reasoning unpersuasive. The financial soundness of the bank is surely a matter of greater public interest than the financial soundness of its parent; yet neither the Board nor the Comptroller of the Currency has asserted any basis for requiring the bank to take any remedial action. Everyone agrees that the financial strength of the bank will be improved by the formation of a holding company and that no adverse consequences will result.