UNITED STATES of America,
Plaintiff-Appellee,

v.

HODGES X–RAY, INC., et al.,
Defendants-Appellants.

No. 84–5316.

United States Court of Appeals,
Sixth Circuit.

Decided April 18, 1985.

Argued Feb. 13, 1985.

Robert L. Ackerson (argued), W. David Kiser, Ackerson, Ackerson & Blandford, Louisville, Ky., for defendants-appellants.

Ronald E. Meredith, U.S. Atty., Louisville, Ky., Michael Spalding, Anita Johnson (argued), David Grise, Office of Consumer Litigation, Civil Div., U.S. Dept. of Justice, Washington, D.C., Arthur Y. Tsien, Asst. Chief Counsel for Enforcement U.S. Food and Drug Admin., Rockville, Md., for plaintiff-appellee.

Before JONES and KRUPANSKY, Circuit Judges, and BROWN, Senior Circuit Judge.

KRUPANSKY, Circuit Judge.

Defendants Hodges X-Ray, Inc. and James J. Hodges appealed from the grant of summary judgment in favor of the United States, wherein the court assessed $20,500 in civil penalties against each defendant for violations of certain Food and Drug Administration (FDA) regulations. The assessments were predicated upon the finding of the court below that x-ray equipment manufactured by the defendants[1] failed to

---

1. Hodges X-ray, Inc. sold its assets to Western States Chiropractic Supply Ltd. on October 3,

comply with 21 C.F.R. § 1020.31(a)(1), which requires a display of exposure time on the control panel in seconds, and 21 C.F.R. § 1020.31(a)(2), which mandates that each machine terminate exposure at a preset time.

Hodges commenced manufacturing its "Trace-Ray III" x-ray units in 1976. The control panel calibrated exposure time in "pulses" rather than the traditional increments of seconds. According to industry standards, one "pulse" is equivalent to 1/120 of a second. The equipment was distributed to dentists, chiropractors and veterinarians throughout the United States.

In a telegram transmitted on March 17, 1977, the FDA notified Hodges of the failure of some units to terminate exposure at the present time interval. In a follow-up letter to Hodges on April 25, 1977, the FDA asserted a defect in the failure of the units to (1) correctly terminate exposure and (2) to indicate exposure time in increments of seconds. These violations are the subject of the instant appeal.

In further correspondence to Hodges dated July 5, 1977, the FDA recommended certain corrective procedures to alleviate the asserted violations, namely, the failure of the units to display exposure time in seconds. The FDA requested that Hodges supply each Trace Ray III purchaser with a self-adhesive label on the unit, which would explain that one pulse was equal to 1/120 of a second, with instructions to the purchaser to attach the label to the control panel of each unit in a prominent place.

On August 5, 1977, Hodges informed the FDA that notice by certified mail had been forwarded to each owner of a Trace-Ray III x-ray unit. Each recipient was provided with the FDA sanctioned self-adhesive label with instructions to affix the labels to the unit in a prominent place. Hodges further notified the FDA that it was "in the process" of checking the equipment for noncompliance with the exposure termination regulation, 21 C.F.R. § 1020.31(a)(2).

On September 20, 1977, the FDA conditionally approved the corrective action, provided that Hodges X-ray, Inc. or its designated representatives, and not only the users, examined all units for the labeling and exposure deficiencies.

In October, 1977, Hodges, X-ray, Inc. was sold to Western States, but James Hodges was retained as "consultant" to the new owners.[2] In this capacity, Hodges notified the FDA that the corrective procedures had come to fruition. According to the declaration submitted by Robert G. Britain, the deputy director of the Office of Medical Devices in the FDA's National Center for Devices and Radiological Health, however, the corrections were not made to the FDA's satisfaction. Britain further explained that the FDA notified Hodges in August, 1979, of its intent to take regulatory action unless Hodges undertook additional corrective measures. Hodges responded by stating that the firm's assets had been sold and thus it could not carry out the corrective modifications.

In September, 1979, the FDA decided to initiate more stringent action because, according to Britain, "in conjunction with the danger to health, some units were being redistributed or considered for export, while others were being repaired inadequately or without adequate supervision." Thus, the FDA instituted seizure proceed-

1977. As both corporations are now defunct, and since Western States was not named in the complaint, this appeal in reality is being pursued by Hodges the individual. Therefore, the defendant corporation and its previous president and major shareholder, defendant James Hodges, will be collectively referred to as "Hodges".

**2.** As the court below noted, there was absolutely no evidence in this case that Hodges X-ray, Inc.

was sold as a method of avoiding liability for the defects in the machines. To the contrary, Western States purchased Hodges, Inc. for about $400,000, but only remitted approximately $100,000 of the price before defaulting. As the principals of Western States have filed for bankruptcy, it is indeed questionable as to whether Hodges will ever realize the full benefit of the sale.

ings against all known Trace-Ray III machines, including about 115 manufactured by Hodges X-ray, Inc. Britain also averred that "[a]lmost all of the Traceray [sic] III machines have been condemned, and either released for reconditioning under FDA's approval or destroyed. Those seizures are one of the largest multiple seizures in FDA's history and required a major commitment of agency resources."

As a result of the foregoing, the government filed its complaint for civil penalties on October 7, 1981. The complaint alleged that Hodges violated the Radiation Control for Health and Safety Act of 1968 (RCHSA) by: (1) introducing into interstate commerce sixty-six diagnostic X-ray machines that failed to comply with two applicable performance standards promulgated pursuant to RCHSA, 42 U.S.C. § 263j(a)(1); and (2) certifying that the machines complied with all performance standards when in fact the machines did not comply, 42 U.S.C. § 263j(a)(5). In accordance with 42 U.S.C. § 263k(b)(1), the government sought the maximum statutory fine, i.e. $66,000 in penalties from the corporation and $66,000 from James J. Hodges, for sixty-six alleged violations of the RCHSA committed by each defendant.

The government subsequently moved for summary judgment with respect to forty defective machines.[3] Hodges cross-motioned for summary judgment as to all of the violations, and asserted the nonliability of James J. Hodges in his individual capacity. On December 6, 1983, the district court granted summary judgment to the government on all of the violations incorporated in its motion and entered judgment against both defendants. *United States v. Hodges X-Ray, Inc.*, 582 F.Supp. 35 (W.D.Ky.1983). The court referred the determination of the amount of civil penalties to FDA. On February 4, 1984, the court amended its judgment to assess civil penalties of $20,500 against the corporation and $20,500 against James J. Hodges individually.

Hodges presented five allegations of error in this appeal, and argued that material issues of fact remained which made summary judgment inappropriate.

As a threshold issue, Hodges urged that he could not be held individually liable for the statutory violations asserted in the government's complaint. More specifically, Hodges argued that he was not a "manufacturer" within the meaning of 42 U.S.C. § 263j.[4] However, this argument is not persuasive for several reasons.

First, 42 U.S.C. § 263c(3) defines the term "manufacturer" as "any *person* engaged in the business of manufacturing, assembling, or importing of electronic products." (emphasis added). Since Hodges was the major shareholder and president of Hodges X-ray, Inc., the conclusion that he was included in this definition is self-evident.

Secondly, in an analogous situation litigated under the Federal Food, Drug & Cosmetic Act (FDCA), the Supreme Court decided that corporate officers could be held individually liable for violations of public health legislation. *United States v. Park*, 421 U.S. 658, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975); *United States v. Dot-*

---

**3.** The government's complaint was based on 44 performance and 22 certification violations by each defendant. The government did not move for summary judgment on four performance and three certification violations, leaving 59 violations by each defendant for summary judgment.

**4.** In parts relevant to the instant case, 42 U.S.C. § 263j provides:

§ 263j. **Prohibited acts**

(a) It shall be unlawful—

(1) for any manufacturer to introduce, or to deliver for introduction, into commerce, or to import into the United States, any electron-

ic product which does not comply with an applicable standard prescribed pursuant to section 263j of this title;

\*    \*    \*    \*    \*    \*

(5) for any person (A) to fail to issue a certification as required by section 263(h) of this title, or (B) to issue such a certification when such certification is not based upon a test or testing program meeting the requirements of section 263f(h) of this title or when the issue, in the exercise of due care, would have reason to know that such certification is false or misleading in a material respect.

*terweich,* 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943).

Although the *Park* and *Dotterweich* cases were premised upon the FDCA, the RCHSA is undeniably in the same class of public welfare statutes and thus the conclusions of those cases are equally applicable here.

Hodges attempted to distinguish *Park* and *Dotterweich* with the argument that they applied to criminal, rather than civil liability. However, the rationale for holding corporate officers criminally responsible for acts of the corporation, which could lead to incarceration, is even more persuasive where only civil liability is involved, which at most would result in a monetary penalty. The fact that a corporate officer could be subjected to criminal punishment upon a showing of a responsible relationship to the acts of a corporation that violate health and safety statutes renders *civil* liability appropriate as well. Therefore, the district court's determination that Hodges could be held individually liable for RCHSA violations should not be disturbed on appeal.

■ A second error of law which Hodges charged against the court below was its reliance upon allegedly improper evidence presented in the form of 45 sworn declarations of FDA inspectors which detailed the defects in the Trace-Ray III machines revealed by their tests. Hodges argued that since certain other collateral "documents" were attached to these declarations by agency personnel other than the declarants, the provisions of Fed.R.Civ.P. 56(e) were violated which demand that sworn affidavits submitted for summary judgment purposes should have been within the personal knowledge of the affiant. This argument has little merit.

The sworn statements of the FDA inspectors as to the condition of the twenty-three Hodges' machines were clearly within their personal knowledge, since these inspectors personally tested the machines. Therefore, the statements provided an adequate basis for the grant of summary judgment. As the defendant observed, some of the sworn statements had attachments that were supplementary and contained purely background information on FDA's regulatory plan and its execution. However, the background information did *not* nullify the personal cognizance of the specific machines' short-comings as outlined in the inspectors' sworn statements. "The rule is settled that on a motion for summary judgment a court will disregard only the inadmissible portions of a challenged affidavit offered in support of or opposition to the motion and will consider the admissible portions in determining whether to grant or deny the motion." *Lee v. National Life Assurance Co.,* 632 F.2d 524, 529 (5th Cir. 1980). *See also Perma Research and Development Co. v. Singer Company,* 410 F.2d 572, 578–79 (2d Cir.1969).

Hodges cites *Cummings v. Roberts,* 628 F.2d 1065, 1068 (8th Cir.1980), in support of his contention that the FDA declarations should be stricken. *Cummings* is inapposite because the affidavit relied upon to support summary judgment did not demonstrate personal knowledge of the *material* facts in that case, and additionally, the attachments to the affidavit in *Cummings* were not demonstrated to be based upon personal knowledge.

Hodges' third assertion of error is that the district court incorrectly interpreted the performance standard of 21 C.F.R. § 1020.-31(a)(2), which requires X-ray timers to terminate exposure at a pre-selected interval. The regulation states:

> (2) **Timers.** Means shall be provided to terminate the exposure at a preset time interval, preset product of current and time, a preset number of pulses, or a preset radiation exposure to the image receptor.

The interpretation of the above regulation advocated by the FDA and accepted by the court below was that a single depression of the timer switch should result in a single exposure. During testing by the FDA, however, it was discovered that if the timer switch on some of the Trace-Ray III units remained depressed, a second expo-

sure would occur anywhere from one to seven seconds after the initial exposure was completed. The FDA deemed such repeat exposure violative of § 1020.31(a)(2).

In support of this interpretation, the FDA cited the congressional intent to minimize the public's exposure to x-rays, and further observed that if a double exposure erroneously occurred due to the continued depression of the switch by the operator, the film would be of poor quality, necessitating a third exposure of the subject in order to insure a quality x-ray. Hodges' argued that the regulation only requires that the *initial* exposure terminate at the preset time, and that the possibility of a second exposure, albeit extremely slight with an experienced operator, is not proscribed by the regulation at issue.

In highly technical areas, such as the proper functioning of a timer on radiographic equipment at issue herein, the courts generally defer to the construction adopted by the administrative agency charged with applying and enforcing the relevant regulations. *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 565, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980); *Udall v. Tallman,* 380 U.S. 1, 16–18, 85 S.Ct. 792, 801, 13 L.Ed.2d 616, *rehearing denied,* 380 U.S. 989, 85 S.Ct. 1325, 14 L.Ed.2d 283 (1965). An exception to the rule arises when the agency interpretation is demonstrably irrational. *Board of Governors v. First Lincolnwood Corp.,* 439 U.S. 234, 251, 99 S.Ct. 505, 514, 58 L.Ed.2d 484 (1978).

In the case at bar, the district court adopted the construction of the word "terminate" that was suggested by the agency, an interpretation that was not only rational but also protective of the public health and safety. Given the purpose of the RCHSA,[5] it appears that the FDA would have been remiss in interpreting the standard to permit a second, unnecessary radiation exposure, which in turn, could have required a third exposure to obtain a usable film. Consequently, the lower court's construction of § 1020.31(a)(2) should not be disturbed.

Hodges also charged error as to the granting of summary judgment where the defendants allegedly joined material issues of fact concerning the validity of the test results upon which the FDA predicated its charges of "timer" violations. In ascertaining whether "material issues of fact" precluded the grant of summary judgment in the instant case, this court is mindful of the standards which govern summary disposition.

First, the court must construe the evidence most strongly in favor of the party opposing the motion. In addition, affidavits supporting the movant are closely examined while those of the opponents are indulgently treated. Finally, the court may not resolve factual issues. It simply must determine whether there is any genuine issue of material fact. *Tee-Pak, Inc. v. St. Regis Paper Co.,* 491 F.2d 1193, 1195 (6th Cir.1974); *Bohn Aluminum and Brass Corp. v. Storm King Corp.,* 303 F.2d 425, 427 (6th Cir.1962).

In the instant case, Hodges argued that he raised material issues of fact concerning the adequacy, reliability and validity of the test procedures applied by the FDA and the conclusions derived from those tests. Specifically, Hodges urged that genuine issues of material fact existed concerning the adequacy of power supply, calibration, and possible abusive testing of the units.

For example, Hodges noted that 21 C.F.R. § 1020.31(b), which delineates the government's standards for x-ray equipment, effectively absolves a manufacturer from liability for noncompliance where the power supply does not satisfy the Kilovolt Amperage (kVa) specifications of the manufacturer. That section states:

---

**5.** The enabling statute relevant to the instant case instructs the Secretary to "prescribe performance standards ... to control the emission of electronic product radiation ... if he determines such standards are necessary *for the protection of the public health and safety."* 42 U.S.C. § 263f(a)(1) (emphasis added).

Reproductibility. The following requirements shall apply when the equipment is operated on an adequate power supply as specified by the manufacturer ...

In addition, 21 C.F.R. § 1020.31(c) provides:

Linearity. The following requirement applies when the equipment ... is operated on a power supply as specified by the manufacturer ...

The "adequate power supply" specified by Hodges X-ray, Inc. for the Trace-Ray III unit was 37.5 kVa (Kilovolt Amps). However, when defendants deposed Floyd Dwight Herd (Herd), an FDA auditor who performed tests on some of the noncomplying Trace-Ray III units, Herd stated that none of the specially-designed procedures used by the FDA to test the Trace-Ray III required or even suggested that the power supply be measured. Herd further admitted that an electrical supply, other than that specified by the manufacturer, could have an "adverse effect" on the operation of the equipment. Herd also supplied information that of the ten Trace-Ray III units he tested, only two had malfunctioning timers.

As Hodges emphasized, only 19 of the 115 Trace-Ray III units the FDA seized and tested allegedly repeated an exposure if the exposure button remained depressed. Hodges further argued in his brief that "[i]f a design defect caused the repeat exposure, then the alleged problem should have been found in all 115 units manufactured by [Hodges X-ray, Inc]. The fact that only 19 of the units exhibited alleged noncompliance demonstrates that an inadequate power supply may well have been the source of the alleged problem on these few units." Hodges also observed that the district court did not fully comprehend this argument, as it related that Hodges "has raised the possibility that there might have been *power failures*" during the testing.

*Hodges X-Ray, Inc.*, 582 F.Supp. at 38 (emphasis added). Thus, the district court apparently mischaracterized Hodges' highly sophisticated argument as advancing "the mere possibility of a malfunction [which] is not sufficient to allow the question of malfunction of the testing equipment to be considered by the trier of fact." *Id.*

The applicable regulations clearly state that the requirements contained therein are premised upon a power supply specified by the manufacturer, to insure the proper operation of the equipment, *see* 21 C.F.R. §§ 1020.31(b) and (c). These regulations further excuse a manufacturer from liability where the noncompliance of the system "is attributable solely to the improper installation or assembly of the component into the system ..." 21 C.F.R. § 1020.-30(f)(1). Thus, the material questions which Hodges raised below as to the validity of the FDA's test results remain unresolved, as it was admitted by the FDA that: (1) an accurate power supply is critical to the machine's performance; and (2) the power supply was not checked prior to conducting the tests at issue herein.

In addition, FDA auditor Herd conceded that certain calibrations of the unit must be accomplished upon installation pursuant to the manufacturer's specifications, which the FDA admits were not completed or implemented in the instant case. Finally, Hodges raised a key question as to the validity of test results which were accumulated by repeating the exposure cycle up to 90 consecutive times at one minute intervals, when the FDA's own regulations mandate that "[d]etermination of compliance shall be based on *ten* consecutive measurements taken *within a time period of one hour.*" 21 C.F.R. § 1020.31(b)(2) (emphasis added). *See also* 21 C.F.R. § 1020.31(c)(2).[6]

In sum, Hodges' liability for violation of 21 C.F.R. § 1020.31(a)(2) for failure of the timer to "terminate" at a present

---

**6.** As the FDA aptly observed, the "ten measurements per hour" requirement of §§ 1020.-34(b)(2) and (c)(2) governs testing for compliance with "reproductibility" and "linearity" standards rather than the timer regulation at issue herein. However, FDA auditor Herd acknowl-edged in his deposition that abusive testing of the x-ray equipment, such as repetitive operation without significant time for the units to cool, could result in a malfunction of the timer switch as well as other components of the machines.

time interval was predicated solely on the test results gathered by 45 FDA auditors. Obviously, Hodges could not bear the expense of deposing each of them, but the individual he did depose, Herd, acknowledged that some of the critical variables in the operation of the equipment, including calibration and power supply, were not verified prior to testing. The case must, therefore, be reversed and remanded as to the charges that arise pursuant to 21 C.F.R. § 1020.31(a)(2) as they were inappropriate for disposition by summary judgment.

■ Hodges also contended that the district court incorrectly applied 21 C.F.R. § 1020.31(a)(1) to the instant case. That provision reads:

### § 1020.31  Radiographic equipment.

The provisions of this section apply to equipment for the recording of images, except those involving use of an image intensifier.

(a) **Control and indication of technique factors—(1) visual indication.** The technique factors to be used during an exposure shall be indicated before the exposure begins, except when automatic exposure controls are used, in which case the technique factors which are set prior to the exposure shall be indicated. On equipment having fixed technique factors, this requirement may be met by permanent markings. Indication of technique factors shall be visible from the operator's position except in the case of spot films made by the fluoroscopist.

In conjunction with the above requirement, 21 C.F.R. § 1020.30(b)(36)(iii) states that "technique factors" include "exposure time [measured] *in seconds*" (emphasis added).

Read literally, these regulations require that the x-ray machine's control panel must clearly measure the exposure time *in seconds*. The defendants' equipment, however, had a scale on the control panel calibrated from 000 to 999 for setting exposure time. This numerical scale was calibrated in "pulses", not seconds. In addition, it failed to display an explanation that each marking on the scale was equated to

1/120th of a second. As noted previously, Hodges attempted to correct noncompliance with 21 C.F.R. § 1020.30(a)(1) by supplying adhesive labels to the owners with instructions to attach the labels to the machines. However, FDA auditors averred in their declarations that this corrective campaign had not been fully implemented.

Hodges emphasized that he believed the "pulse" scale calibration was a more accurate and advanced timing measurement than the standard timer which was calibrated in "seconds", and that he attempted to correct the noncompliance with the FDA-approved labels. While these factors may be relevant to the mitigation of damages, they do not serve to negate his liability. The statute which Hodges violated proscribed the placement of noncomplying machines into commerce. The violation therefore occurred at the time of distribution, and the fact that Hodges did not intend to break the law and subsequently took steps to correct his error does not lessen his potential civil liability.

■ Hodges' final argument charged that the district court improperly assessed the amount of civil penalties without a hearing. However, a hearing for the purpose of determining the amount of civil penalties is not mandatory. *United States v. J.B. Williams Co.*, 498 F.2d 414, 438–439 (2d Cir.1974) (imposing the maximum civil penalty on two counts without a penalty hearing). Moreover, the record contained sufficient evidence from which to ascertain the amount of penalties to be assessed. (The statute provides a maximum $1,000 penalty for each violation.) Further, a number of equitable factors were before the district court, which, though irrelevant to the imposition of liability, were appropriate for consideration in determining the proper amount of penalties. These included the sale of Hodges' assets to another corporation and Hodges' attempts to take corrective action. Finally, the RCHSA provides that the civil penalty assessed by the court "may on application be remitted or mitigated by the Secretary [of the U.S. Department of Health and Human Services]," 42 U.S.C. § 263k(b)(2). Thus, the statute explicitly provides Hodges with an

opportunity to seek reduction of the civil penalties by the administrative agency. In view of this remedy provided by statute, Hodges' argument that the district court is required to hold a separate hearing on the amount of civil penalties is without merit.

In conclusion, the district court is affirmed as to its conclusions that Hodges was individually liable for the noncompliance of the Trace-Ray III machines; that the auditors' affidavits were properly admitted as evidence; its interpretation of the timer regulation, 21 C.F.R. § 1020.31(a)(2) as requiring only one exposure per depression of the switch; its interpretation of 21 C.F.R. § 1020.31(a)(1) as mandating the control panel scale to be calibrated in seconds; and its assessment of penalties without a hearing. However, as material issues of fact remain concerning the validity of the test results submitted by the FDA, summary judgment as to the alleged repeat exposure by the timer switch in violation of 21 C.F.R. § 1020.31(a)(2) was inappropriate. The case is therefore reversed and remanded with instructions to proceed to trial consistent with this decision.