**SOUTHERN MOLDINGS, INC.,**
**Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 81–1230.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 23, 1983.

Decided Aug. 23, 1983.

Rehearing En Banc Granted Oct. 6, 1983.

Jon C. Flinker (argued), Duvin, Flinker & Cahn Co., Cleveland, Ohio, for petitioner.

Elliott Moore, Deputy Associate Gen. Counsel, Ralph Simpson (argued), N.L.R.B., Washington, D.C., for respondent.

Dennis J. Buckley, Cincinnati, Ohio, Irwin H. Cutler, Jr. (argued), Louisville, Ky., for intervenor.

Before KEITH, JONES and WELL-FORD, Circuit Judges.

KEITH, Circuit Judge.

This case is before us on a petition for review and a cross-petition for enforcement of an order of the National Labor Relations Board. The Board found that the petitioner, Southern Moldings, Inc. (the company), committed several violations of §§ 8(a)(1) and (5)[1] of the National Labor Relations

---

1. Section 8 of the National Labor Relations Act, 29 U.S.C. § 151 as amended, specifies Employer Unfair Labor Practices. The relevant provisions from that Section are as follows:

    (a) Unfair labor practices by employer. It shall be an unfair labor practice for an employer—

      (1) to interfere with, restrain or coerce employees in the exercise of the rights guaranteed in Section 7.

      (5) to refuse to bargain collectively with the representatives of his employees. . . .

The above provisions were designed to protect the rights of employees. Those rights are defined in Section 7 of the Act which states:

    Sec. 7. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activi-

Act by interfering with a representation election. The decision and order of the Board are reported at 255 N.L.R.B. 115 (1981). The company challenges this finding and seeks to have the bargaining order set aside.

Southern Moldings, Inc., operates a plant in Frankfurt, Kentucky which manufactures parts for the automotive and appliance industries. This company had its genesis in two prior companies, the first of which, also called Southern Moldings, opened in 1953 and ceased operations in 1959. The company was then purchased by H.K. Porter. Several years later H.K. Porter also discontinued its manufacturing business. When the company reopened in 1974 as the new Southern Moldings, the majority of the company's employees were represented by Allied Industrial Workers' Union. Shortly after the business began its operations, an election was held pursuant to a decertification petition and Allied Industrial Workers was decertified.

Four years later, the United Auto Workers (Union) initiated a campaign to organize at Southern Moldings. The actions taken by the company during the Union's campaign to become the bargaining representatives of its employees gave rise to the series of unfair labor charges presently before this Court.

### I.

### Facts

The Board's conclusion that the company had engaged in unfair labor practices is based upon the following findings. The first union organizational meeting was held on August 11, 1978. Union authorization cards were obtained and employee signa-

tures were solicited. By August 25, the union had received valid authorization cards from 101 of 163 employees. Thus, it dispatched a letter on that date to the company seeking recognition and bargaining. Three days later, it filed a representation petition with the Board.

On August 30, the company's superintendent and part-owner, Dominick Moccia, observed employees distributing union literature. That afternoon and the following day, he informed four employees that the company prohibited soliciting on company property and that any employee caught doing so would be reprimanded. Moccia also informed another employee that he was not to distribute literature on company property. Following these conversations, Moccia contacted the personnel manager and asked. him to make a note of the above incidents. Consequently, the names of the five employees were placed in the "warning log" with the notation, "Passing out material/solicitation verbal warning." On September 5, the company posted a notice which prohibited employees from any solicitation on company property during working hours, and prohibited the distribution of literature *at any time* without prior written permission.[2] Prior to this notice, the company had never informed employees of solicitation or distribution restrictions. In fact, Avon and Tupperware solicitation was and continued to be permitted even after the notice was posted.

A meeting was called by company president Sullivan on September 11 to discuss the union campaign with the employees. Sullivan told the employees that they did not need a union and that he had been fair with them. During the meeting, he in-

ties for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a)(3).

2. The original No-Solicitation Notice appeared as follows:

SOLICITATIONS
Employees shall not engage in any solicitation of any kind on the premises of the Com-

pany during any time they are expected to be working. Furthermore, employees shall not distribute any kind of notices, circulars, or written materials *at any time* without prior written permission from the Personnel Department, and there shall be no littering on the premises of the Company. Furthermore, the posting of notices, signs or written materials of any kind on the Company's premises is prohibited unless authorized in writing by the Personnel Department (emphasis added).

formed employees as well that they would not be receiving their annual raises which were due on September 17. He stated that granting raises during a union election campaign was forbidden by labor relations laws since it could be considered a bribe.

On September 12, company officials learned that employees were distributing literature in the parking lot. In light of this information, personnel manager Stansbury, superintendent Moccia and other foremen positioned themselves outside the plant near the employee entrance. Union representatives arrived about the same time and stood across the street. When employees began distributing union handbills, the personnel manager instructed them to take the handbills out to the public road and stop littering the premises. Thereafter, the company recorded the names of the employees who were distributing union material.

On September 22, company president Sullivan called another meeting. He reiterated that the raises would not be granted in light of the impending union election. Sullivan went on to say that he had prior dealings with a union when he worked for the predecessor company, H.K. Porter, and that the union had caused the demise of the company. He additionally stated that if the Union was certified its demands might be so great that the company would have to shut down.

Shortly after the meeting, union representative Kettler sent Sullivan a letter advising that the raises would be legally permissible. Kettler also assured Sullivan, in the letter, that the union would not object to the raises, and that he would be willing to sign an affidavit to that effect.

A third meeting was called by Sullivan on October 2. At this meeting employees were informed that all wages and benefits would be frozen during collective bargaining negotiations if the union won the election. In an October 6 letter to all employees, Sullivan reiterated that there would be a continuous freeze, and stated that there was no guarantee that employees would retain existing benefits during negotiations. The letter also speculated that union strikes during negotiations could result in loss of income.

In the weeks that followed, employees were warned by a company foreman that their jobs would be placed in jeopardy if they were caught wearing union buttons or reading union literature. The foreman further cautioned employees against union representation by stating that unionization would inevitably lead to a strike; and if that happened, the company would lose its contract with Chrysler Corporation and have to close.[3] In response the union representative sent letters to the foreman indicating that the employees had a right to wear union buttons, and that if he continued to threaten the employees or otherwise interfere with their rights, an unfair labor practice charge would be filed. Also during the middle of October the company posted a new solicitation notice prohibiting distribution "at any time they [were] expected to be working." This notice differed from the previous notice which prohibited distribution of literature "at any time."[4]

The company president conducted his final pre-election meetings with employees on October 19, 25 and 26. At these meetings he again discouraged union representation by asserting that it would hurt the compa-

---

**3.** Southern Moldings' principal product is door window frames. It is Chrysler Corporation's sole supplier of frames. The clear implication of the foreman's comment was that Chrysler would cancel Southern Moldings' contract for this product if production ceased due to a strike.

**4.** The Company conceded that the former No-Solicitation notice posted on September 5 was overly broad. However, the Company maintained that the Notice did not interfere with employees' Section 7 rights, because they ig-

nored the stated prohibitions. Furthermore, the Company maintains that the error was rectified on October 18, when it posted the revised notice.

The ALJ rejected these arguments. She stated: "The fact that some employees continue to assert their rights notwithstanding the invalid rule does not negate its general coercive effect." Moreover, the ALJ found that the revised Notice was not posted until 9 days prior to the election. Thus, the invalid rule was in effect during most of the pre-election campaign period.

ny, reduce productivity and decrease job security. For example, in his October 19th speech, Sullivan relayed that he had talked with managers of companies whose employees voted to unionize. According to Sullivan: "They all say the same thing. It's not necessarily wage and benefit costs that hurt these companies, because they are often able to negotiate less in wages and less in benefits than they would have given without a union. What hurts is the loss of production and the rising costs that come from the restrictive practices and hassling that a union can often bring."

The Board representation election was held on October 27, 1978. The election resulted in a vote of ninety-one against the union and seventy-six for the union. The union filed timely objections to the election results alleging numerous threatening coercive practices of the company. These election objections were consolidated with similar unfair labor practice charges filed earlier by the union. Meanwhile, the company granted a wage increase on November 6, retroactive to September 17.

Prior to the January 19, 1979 hearing before an Administrative Law Judge, the company extensively interrogated employees regarding union activities. The ALJ credited the testimony of six employees who stated that they had not been given assurances against reprisals prior to the company's interrogations. One employee also revealed that she was not informed that the interview was voluntary until after she refused to answer a question. A company official admitted that he asked each employee whether he or she attended union meetings and asked each to identify other employees who attended union meetings. The official further admitted that asking employees for the identity of other individ-

uals who attended union meetings was not for the legitimate purpose of investigating the circumstances surrounding the signing of union authorization cards.[5]

Based on the foregoing evidence, the ALJ determined that the company's conduct had so undermined the union's card-based majority that it prevented a fair election. In affirming the ALJ's findings, the Board concluded that the company violated Section 8(a)(1) of the Act in the following manner: 1) by announcing to employees a rule prohibiting solicitation and distribution on company property; 2) by promulgating and enforcing a no-distribution rule prohibiting employees from distributing literature in non-working areas during non-working time; 3) by threatening employees with discipline for wearing union buttons and for distributing and receiving union literature; 4) by withholding employees' scheduled annual wage increases because the union filed a representation petition; and 5) by threatening employees with plant closure and loss of benefits if they voted to elect the union as their collective bargaining representative.

In deciding to issue a bargaining order, the Board stated the following:

We agree with the Administrative Law Judge ... that the unfair labor practices committed by the Respondent warrant issuance of a bargaining order. In addition to the unfair labor practices relied on by the Administrative Law Judge, we also rely on her finding, with which we agree, that shortly before the hearing Respondent violated Section 8(a)(1) of the Act by conducting prehearing interrogations which exceeded the permissible bounds of pretrial preparation and which were conducted without observing all of

---

**5.** The ALJ recognized that an employer may lawfully interview employees on matters pertinent to an unfair labor practice proceeding. *Surprenant Mfg. Co. v. NLRB,* 341 F.2d 756 (6th Cir.1965). However, this narrow privilege "does not include the right to pry into matters of union membership, to discuss the nature or extent of union activity or to dissuade employees from joining or remaining members of a union." *Id.* at 763. This Court has stated that interrogations "must be viewed as the employ-

ee would have interpreted [them], having in mind the total conduct of the employer." *Jervis Corp. v. NLRB,* 387 F.2d 107, 111 (6th Cir.1967). In light of these principles, we sustain the findings of the Board that the interrogations exceeded the boundaries of legitimate inquiry. Moreover, the failure to adequately inform several employees of the voluntary nature of the interrogations was a clear violation of Section 8(a)(1) of the Act.

the safeguards established by the Board for such interrogations. The fact that Respondent's unlawful conduct extended beyond the election to the eve of the unfair labor practice hearing reveals, in our view, a continuing hostility toward the Union and further reduces the possibility of erasing the effects of Respondent's unfair labor practices and of ensuring a fair rerun election by use of traditional Board remedies. Accordingly we shall issue a bargaining order as recommended by the Administrative Law Judge.

255 N.L.R.B. 115.

## II.

### Discussion

On appeal, the company challenges the Board's findings as well as its decision to issue a bargaining order rather than ordering a new election. We note from the outset that the Board's findings must be sustained so long as they are supported by substantial evidence [6] on the record viewed as a whole. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 493, 71 S.Ct. 456, 467, 95 L.Ed. 456 (1951). *NLRB v. Buckhorn*

*Hazard Coal Corp.,* 472 F.2d 53, 55 (6th Cir.1973).

First, the company argues that the Board's finding that it violated § 8(a)(1) by postponing a general wage increase was erroneous. The company contends that the decision to delay the wage increase was a good faith attempt to eliminate the appearance of giving a wage increase to induce votes against the union. This decision was allegedly based upon a notice from the National Labor Relations Board indicating that it is improper to grant a pay raise to influence an employee's vote.[7]

In this regard, the company correctly notes that an employer may not grant wage increases or other benefits to employees for the purpose of inducing them to vote against the union. *NLRB v. Exchange Parts Co.,* 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964). However, it is equally true that an employer is precluded from withholding a scheduled or previously planned benefit because of a union organizational campaign. This Court has held that in order for an employer to violate § 8(a)(1) by withholding a wage increase, there must be substantial evidence in the record to establish a pattern regarding the

**6.** Substantial evidence is more than a mere scintilla. "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). The Supreme Court has adhered to that definition in varying statutory situations. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *See Steadman v. SEC,* 450 U.S. 91, 99, 101 S.Ct. 999, 1007, 67 L.Ed.2d 69 (1981); *Board of Governors v. Linwood Corp.,* 439 U.S. 234, 253, 99 S.Ct. 505, 515, 58 L.Ed.2d 484 (1978); *Consolo v. Federal Maritime Commission,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966).

**7.** The N.L.R.B. Notice relied upon by the Company stated:

The Board applies rules to keep its elections fair and honest. If agents of either Unions or Employers interfere with your right to a free, fair, and honest election, the election can be set aside by the Board. Where appropriate, the Board provides other remedies, such as reinstatement for employees fired for exercising their rights, including backpay from the party responsible for their discharge.

The following are examples of conduct which interfere with the rights of employees and may result in the setting aside of the election:

Threatening loss of jobs or benefits by an Employer or a Union

Promising or granting promotions, pay raises, or other benefits, to influence an employee's vote by a party capable of carrying out such promises.

The employer contends that it interpreted this letter to forbid the granting of a scheduled wage increase. However, the ALJ noted that the law clearly states that the decision to withhold or grant an increase should be unaffected by the presence of unionizing activities. The notice sent to the company is wholly consistent with this established body of labor law. We, therefore, reject the pretext given by the company for withholding the scheduled wage increase and sustain the Board's finding of a section 8(a)(1) violation. This finding is supported by substantial evidence. The letter from the union representative assuring the company that a wage increase was permissible militates against a contrary finding. Moreover, the representative indicated a willingness to sign an affidavit stating that it would not object to such a raise.

amount and timing of wage increases. *NLRB v. Travis Meat and Seafood Co., Inc.,* 653 F.2d 233 (6th Cir.1980). As a general rule, the employer must decide whether to grant or withhold an increase in wages just as if the union were not involved. *May Department Store d/b/a Famous Barr Company,* 174 N.L.R.B. 109 (1969). In short, the company should maintain established policies. *Travis Meat and Seafood Co.,* 653 F.2d at 235. Here, it was clear that the company's policy for the last three years had been to grant annual wage increases in mid-September. Therefore, the departure from standard policy because of union organizing constituted a violation of Section 8(a)(1).

Secondly, the company challenges the Board's finding that its pre-election speeches were coercive and constituted a violation of § 8(a)(1). The Board found that the company president, through his speeches, attempted to coerce employees into voting against the union. This was accomplished, according to the Board, by telling employees that union representation would inevitably bring strikes, loss of jobs, lower wage increases and plant closures. The company correctly maintains that federal labor policy anticipates uninhibited, robust and open campaigns. *Linn v. United Plant Guard Workers,* 383 U.S. 53, 62, 86 S.Ct. 657, 662, 15 L.Ed.2d 582 (1966). Such public debate affords employees the opportunity to hear all sides of the issues in order to exercise the informed reasoned choice that is their right. *Colonial Corp. v. NLRB,* 427 F.2d 302 (6th Cir.1970). In fact, Section 8(c) of the Act specifically provides that the "expressing of any views, argument, or opinion . . . shall not constitute evidence of an unfair labor practice."[8] The company, therefore, contends that President Sullivan's speeches merely constituted an exercise of his protected rights. The company argues that his speeches simply made predictions about the future effects of unionization based upon the company's history.

The petitioner further asserts that Sullivan's predictions comport with the standards set forth in *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). Those standards require that predictions be based on objective facts which convey the employer's belief that the probable consequences are beyond his control. *Id.* at 618, 89 S.Ct. at 1942.

On balance, it appears that the Board had ample basis for concluding that the petitioner exceeded the bounds of his Section 8(c) rights. His speeches went beyond permissible predictions. As the ALJ noted, Sullivan's basic theme was job security and the effect of unionization thereon. Sullivan claimed that a union had caused the closing of the predecessor company, H.K. Porter, and the resulting loss of jobs. The record does not reveal any objective basis for this claim. Moreover, we agree with the ALJ's finding that "such conduct directly inhibits activity in support of the Union and the threat of plant closure, loss of bonuses and failure to secure the most favorable possible wage increase strikes at the very heart of the reasons that employees are most apt to seek union representation—job security and economic benefit."

We conclude from our examination of the record that there was substantial evidence to support the Board's determination that the company engaged in unfair labor practices prior to and after the certification election. We are further satisfied that the Board properly concluded that these violations required that the election be set aside. The only remaining question is whether the Board was correct in ordering the company to bargain with the union, or whether the issuance of a cease and desist order would have sufficed.

The company argues that the facts of this case did not warrant the extraordinary remedy of a bargaining order. The Supreme Court made clear in *NLRB v. Gissel*

---

**8.** Section 8(c) provides:
> The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under . any of the provisions of this Act, if such expression contains no threat of reprisal or force or promise of benefit.

*Packing Co.,* 395 U.S. 575, 613–14, 89 S.Ct. 1918, 1939–40, 23 L.Ed.2d 547 (1969) that the Board can order an employer to bargain with a union in two categories of cases: 1) exceptional cases where, regardless of whether the union has ever obtained majority support, the employer has engaged in "outrageous" and "pervasive" unfair labor practices which make a fair election impossible; and 2) "less extraordinary" cases where the union has at some point obtained majority support and the employer has engaged in unfair labor practices which, although less pervasive, still have a tendency to undermine majority strength and impede the election process. In the second category of cases, a bargaining order is appropriate where the possibility of exorcising the effects of past practices and of ensuring a fair election is slight and employee sentiment once expressed through cards would be better protected by a bargaining order. *Id.* at 614, 89 S.Ct. at 1940. Thus, where valid authorization cards have been obtained by a union for the majority of the employees, the status quo may be most nearly restored by a bargaining order.

■ In this case, the Board found that 100 of the 163 employees in the bargaining unit had signed valid authorization cards as of August 25, 1978. The Board also concluded that the company's activities had undermined the Union's majority status and precluded a fair election. The record is replete with examples of the company's attempt to interfere with solicitation and distribution of union literature. Also abundant evidence exists that the company sought to impress upon its employees that a union would be futile and would most likely result in the loss of benefits, in strikes, in concomitant losses of pay and eventually in the loss of jobs through plant closures. Given these coercive efforts, the bargaining order appears entirely necessary. Therefore where, as here, the coercive practices of the company have undermined majority strength and impeded the election process, a bargaining order may be upheld under the standards set forth in *Gissel.*

The company, however, contends that the bargaining order is inappropriate because the Board has not stated specifically why a bargaining order is necessary in this case, and because it did not consider the effect of employee turnover on the chances for a fair election which would more accurately gauge the sentiments of the present bargaining unit. The specificity requirement was recently reiterated in *NLRB v. Rexair, Inc.,* 646 F.2d 249 (6th Cir.1981). There the court stated that bargaining orders have not been enforced when "the Board made no findings or detailed analysis as to the residual impact . . ., or the likelihood of recurrence, of any of the unfair labor practices, or when they are based on conclusory statements unsupported by sufficient facts." *Id.* at 251. *See Donn Products, Inc. v. NLRB,* 613 F.2d 162 (6th Cir.), *cert. denied,* 447 U.S. 906, 100 S.Ct. 2988, 64 L.Ed.2d 855 (1980).

■ Our requirement in *Rexair,* however, was not intended to abrogate the wide discretion afforded the Board in determining an appropriate remedy. This is particularly true here, since the Board has scrupulously analyzed the facts and has incorporated in its decision the analytical approach mandated by *Rexair.* In a seventy-two page decision the ALJ detailed the facts, analyzed the evidence, and fully assessed the impact of each of the company's unfair labor practices. Thus, the ALJ explained that the company's conduct "was calculated to, and did, undermine the union's majority." The company's conduct directly inhibited employee support for the union and, by threatening employees' job security and economic benefits, struck at "the very heart of the reasons that employees are most apt to seek union representation." Furthermore, by withholding the employees' scheduled annual wage increases, the company made clear "that it could and would enforce its threats." In light of this, the ALJ correctly concluded that the company's conduct was likely to have had a significant adverse impact on the elections, the effects of which could not be expunged through traditional remedies and rendered unlikely or impossible the holding of a fair rerun election.

In adopting the ALJ's findings, the Board additionally observed that the company's

post-election unfair labor practices reduced even further the likelihood of erasing the coercive effects of the company's conduct and allowing a fair rerun election.[9] Since the Board carefully explained the causal connection between the company's unfair labor practices and the conclusions that the election was undermined and that a fair rerun election was unlikely, the Board's analysis fully comports with the mandates of *Rexair*.

Accordingly, Southern Moldings' petition is denied, and the decision of the Board is affirmed. The cross-petition for enforcement of the Bargaining Order is granted.

WELLFORD, Circuit Judge, dissenting.

I respectfully dissent from the court's opinion in this case. While I agree with the court's conclusion that the election should be set aside, I would not enforce the Board's imposition of a bargaining order.

The Board's findings of some improper activities by the Company are supported by substantial evidence, and warrant the order of a new election. I disagree with the court's conclusion, however, first of all insofar as it relies on the withholding of the wage increase as a basis even for setting aside the election. In this situation, the employer seems to be in a genuine dilemma.

In *Heckethorn Mfg. Co.*, 208 NLRB 302, 306 (1974), enf'd. 504 F.2d 425 (6th Cir. 1974), this court upheld a finding by the Board that an employer's withholding of a wage increase until after a union election was over was not violative of the Act. In *Heckethorn*, to determine whether the company had violated the Act, the Board looked at (1) whether there was evidence indicat-

ing that the company intended the withholding of the wage increase to have an effect on the outcome of the election, or whether employees believed such to be the case, and (2) whether the company sought to capitalize on the absence of a wage increase by connecting the absence with the union or the employees' support of the union. In the present case, there is no indication that the company intended to affect the outcome of the election, or that employees believed it intended to do so. Indeed, the company president assured the employees on October 19 that "[i]n any event, when this election is over, you'll be getting your raises no matter how it turns out." In addition, the evidence does not indicate that the company sought to capitalize on the absence of a wage increase. Employees were informed that the wage increase was being withheld because the employer believed federal law prohibited the granting of such an increase pending the union election. There was no attempt to blame the union or the employees who supported the union. Under these circumstances, the Board's finding that the withholding of the wage increase was violative of the Act does not appear to be supported by substantial evidence, especially if that withholding is to be treated as a basis for ordering the employer to recognize a union and bargain with it.

The court's enforcement of the Board's bargaining order does not, moreover, seem justified. Prior decisions by this court indicate that the ALJ's findings and analysis in this case are insufficient to support such a drastic remedy. The usual deference given to NLRB findings is lessened when the

---

9. We realize that under *United Services for the Handicapped v. NLRB*, 678 F.2d 661 (6th Cir. 1982) and *NLRB v. Rexair*, 646 F.2d 249 (6th Cir.1981) deference to the Board's findings is lessened when the Board orders the company to bargain without holding a new election. In *United Services for the Handicapped*, a case in which the Board's bargaining order was enforced, the company dismissed several employees for union related activities. However; the presence of a discriminatory discharge has never been declared the litmus test for the issuance of a bargaining order. The Supreme Court has recognized that the threat of plant

closure is one of the most coercive actions which a company can take in seeking to influence an election. *NLRB v. Gissel*, 395 U.S. 575, 611 n. 31, 89 S.Ct. 1918, 1938 n. 31, 23 L.Ed.2d 547 (1969). *See also Donn Products v. NLRB*, 613 F.2d 162, 166 (6th Cir.1980). The presence of such a threat along with the withholding of a scheduled wage increase, the promulgation of an overly broad no solicitation rule, and the use of pre-hearing interrogations which exceeded permissible bounds convinces us that the Board's determination was supported by substantial evidence.

Board orders "the strong and less preferred remedy of a bargaining order without holding a new election." *United Services for the Handicapped v. NLRB,* 678 F.2d 661, 664 (6th Cir.1982). *Accord, NLRB v. Rexair, Inc.,* 646 F.2d 249, 250 (6th Cir.1981). In addition, bargaining orders have not been enforced by this court when

"[t]he Board made no findings or detailed analysis as to the residual impact ..., or the likelihood of recurrence, of any of the unfair labor practices," or when they are "based on conclusory statements unsupported by sufficient facts" .... or when the Board's reasoning consisted simply of "a litany, reciting conclusions by rote without factual explication."

*United Services for the Handicapped, supra,* 678 F.2d at 664, citing *NLRB v. Rexair, supra.*

In *United Services for the Handicapped, supra,* this court remarked that, under *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1913, 23 L.Ed.2d 547 (1969), the analysis of the Board must concentrate on whether a fair election can be held, and on the present effects of past coercive unfair labor practices. In that case, the Board had found several overt and direct threats of closure if unionization occurred, and that the employer discharged six employees. The court found that the threats and harassment were given a continuing effect by the permanent discharge of employees, and that this strongly supported a conclusion that the fair election process had been tainted. 678 F.2d at 664–65. There has been *no* discharge in the case *sub judice.*

*Donn Products, Inc. v. NLRB,* 613 F.2d 162 (6th Cir.1980), seems analogous to the situation in this case. This Court found in *Donn Products* that the employer had engaged in unfair labor practices, but there was nothing in the record to indicate that any of the violations were of such a substantial and continuing nature as to warrant a bargaining order. The court observed that the Board had made no findings or detailed analysis as to the residual impacts or continuing effect, or the likelihood of recurrence, of any of the unfair labor practices, and that while there were threats, there was no discharge effectuated during the organizing campaign. The *Donn* court noted:

There was a hard-fought campaign, but the classic tactics of discharge and widespread discrimination against and harassment of union sympathizers were not present. Though we have sustained the finding that there was a threat of plant closing, the Board has determined that the actual closing which followed the union's loss of the election was for economic reasons.

613 F.2d at 166. If anything, the acts of the employer in *Donn* were more serious than were those of Southern Moldings.

While in the case at bar the ALJ made detailed findings with regard to the company's violations of the Act, there was a failure to analyze the residual impact or likelihood of recurrence of these actions. The fact that the employer may have some continuing hostility towards the union is not enough to justify a bargaining order; hostility to the union's organization efforts often exist in these situations. The employer in this case in fact posted an overly broad no-solicitation rule that constituted an unfair labor practice. The overbreadth of the rule was cured, however, prior to the union election; this indicates that a violation would *not* recur. Solicitations continued to occur, in fact, on the employer's premises and there was no serious disciplinary action taken. The speeches by the president of the company violated the Act only because they contained predictions as to the effect of unionization that may not have been substantiated by objective facts. There was no indication in these speeches, which involve some first amendment considerations, of vindictiveness or threats that he would close the plant or penalize employees who supported the union. The withholding of the wage increase, even if it was wrongful, was cured by granting the increase after the election, in the face of the union's challenge to the outcome, and making it retroactive to the date on which it normally would have been granted. In sum, the ALJ's findings in this case, which were adopted by the panel majority, seem similar to that found by this court in *NLRB v. Rexair, Inc., supra:*

The ALJ simply recites his findings of the Company's improper activities and then states that a cease-and-desist order could not cure these wrongs. There is no analysis of the residual impact or possible recurrence of these violations, nor explanation why a cease-and-desist order would fail to prevent possible recurrence. 646 F.2d at 251.

*Gissel* itself involved situations where there were discharges of union sympathizers, spying on union meetings, polling employees about union preferences, persistent threats of discharge to pro-union employees, and other discriminatory actions taken sufficient to make it evident that "the *possibility* of erasing the effects of past practices and of ensuring a fair election ... by the use of traditional remedies ... is slight...." 395 U.S. at 614, 89 S.Ct. at 1940 (emphasis added). I do not feel that the facts in this case, or the Board's analysis of the facts, demonstrate that the possibility of a fair election at the Southern Moldings plant is only slight, nor that the unfair labor practices here are comparable to those considered in *Gissel*.

I would, accordingly, enforce the Board's order but only to the extent of ordering a new election in this case.