**James F. THOMPSON, Plaintiff,**

**v.**

**SIMON UNITED STATES HOLDINGS, INC., et al., Defendants.**

**No. 5:96–CV–0924.**

United States District Court, N.D. Ohio, Eastern Division.

Jan. 9, 1997.

Carol M. Lamm, Hudson, OH, for Plaintiff.

John C. Greiner, Cincinnati, OH, Paul J. Dolan, Chardon, OH, for Defendants.

*MEMORANDUM OPINION*

DOWD, District Judge.

## I.  INTRODUCTION

The parties have filed competing motions for summary judgment in this case involving denial of insurance coverage for treatment related to the plaintiff's prostate cancer surgery.  For reasons set forth below, the Court grants the plaintiff's motion and denies the defendants' motion.

## II.  BACKGROUND FACTS

### A.  The Parties and Claims

The plaintiff, James F. Thompson, has named three defendants in his complaint. They are 1) Simon United States Holdings Inc., Thompson's employer at the time of this dispute ("Simon"); 2) Simon United States Holdings Inc. Health and Welfare Benefits Plan, the benefit plan under which he claims eligibility for insurance coverage ("the plan"), and 3) United Medical Resources, Inc., the third-party administrator of claims for the plan ("UMR").  According to the plan's Summary Plan Description, UMR is the *claims* administrator and Simon is the *plan* administrator.

The complaint purports to allege four causes of action.  However, all fall under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq.  ("ERISA"), and in substance boil down to a single claim: the defendants' denial of insurance coverage for his prostate cancer was contrary to the plan and violated his rights under ERISA.  Neither party has attempted to distinguish the causes of action during the briefing process, and the Court will treat the complaint as lodging a single cause of action.

*B. Stipulated Facts*

The parties have stipulated to a summary of relevant facts. The Court will quote the entire stipulation before adding certain other facts it considers to be relevant.

I. At all relevant times, Plaintiff James Thompson was a resident of New Philadelphia, Ohio.

2. Plaintiff was a "new hire" of Defendant Simon United States Holdings, Inc. as of May 24, 1993, and became an eligible Plan participant 60 days thereafter.

3. Plaintiff was laid off from prior employment on April 1, 1993. He had the election under COBRA[1] to continue health coverage through his prior employer's health plan. He did not opt to continue his COBRA coverage.

4. Through his wife's employer, Plaintiff had group health coverage available to him as a dependent through August, 1993. In August, 1993 his wife did not return to her teaching job. He and his wife opted not to elect COBRA continuation coverage.

5. Plaintiff testified that he opted not to continue any COBRA coverage because he was covered under Defendant Plan effective July 1, 1993 and he did not know that Defendant Plan denied his claims related to his prostate surgery due to pre-existing condition clause until after his November, 1993 surgery.

6. At all relevant times, Defendant Employer had established a health and welfare plan for its employees known as *Simon United States Holdings Inc. Health and Welfare Benefits Plan,* hereinafter referred to as "Defendant Plan."

7. Defendant Plan is governed by the Employ[ee] Retirement Income Security Act of 1974 known in popular parlance as "ERISA." Exhibit A attached to and incorporated in the Complaint is a true and accurate copy of the Summary Plan Description in effect at all relevant times.

8. The Summary Plan Description was distributed to Plaintiff by Defendant Plan and received by Plaintiff, sometime after July 1, 1993.

9. The claims administrator of the plan is Defendant United Medical Resources, Inc., hereinafter referred to as Defendant Administrator.

10. Plaintiff presented himself to Dr. Paul McFadden for a pre-employment physical examination on May 24, 1993.

11. During the May 24, 1993 pre-employment physical, Plaintiff testified that he requested a prostate check because of his exposure to recent radio publicity. Plaintiff testified that he was not experiencing any symptoms suggesting prostate problems.

12. During the May 24, 1993 pre-employment physical, Dr. McFadden did a digital check of the prostate and noted[,] "The patient does have an enlarged prostate with an indurated area in the right lobe." Dr. McFadden told Plaintiff to recheck his prostate in four months.

13. During the May 24, 1993 examination, Dr. McFadden ordered a PSA blood test for Plaintiff. The PSA level was 6.3.

14. On September 10, 1993, Plaintiff presented himself to Dr. McFadden who rechecked his prostate and referred Plaintiff to a urologist.

15. On September 10, 1993, Plaintiff presented himself to Dr. Betkerur for examination of prostate.

16. On September 22, 1993, Plaintiff underwent a surgical procedure performed by Dr. Betkerur, known as a needle biopsy of the prostate in order to rule out a diagnosis of prostate cancer. On or around this date, the diagnosis of Prostate Cancer was established.

---

1. "COBRA" is an acronym for Consolidated Omnibus Budget Reconciliation Act, a federal law which allows employees to elect to continue group health coverage at their own expense for a limited time following separation from employment. [Footnote added by Court].

17. On or around November 15, 1993, Plaintiff underwent radical surgery for prostate cancer. The surgery was performed by Dr. Bahnson.

18. On or about October 10, 1993, Defendant Plan mailed, and plaintiff received, an Explanation of Benefits (EOB) showing that Defendant Plan approved benefits for the services of Dr. Betkerur and Dr. McFadden during the month of September.

19. On or about October 27, 1993 Defendant Plan mailed, and Plaintiff received, an Explanation of Benefits (EOB) form showing that Defendant Plan had approved benefits for the services of Dr. Betkerur rendered on October 11, 1993.

20. On and after January 30, 1994, Defendant Administrator mailed and plaintiff received Explanation of Benefits (EOB) forms showing that Defendant Administrator denied all benefits relating to medical services rendered due to Cancer of the Prostate for the reason that the Plan does not cover pre-existing conditions. These EOBs constituted written notice from Defendant Administrator to Plaintiff that the November 1993 surgery was not covered under the Plan.

21. Plaintiff received pre-admission letters from Defendant Administrator acknowledging his scheduled surgery. The pre-admission letters are dated 10/28/93 and 11/30/93, respectively.

22. The medical bills not paid by Defendant Plan due to its denials on grounds of pre-existing condition total $31,261.25.

23. Plaintiff exhausted all administrative appeals available to him under Defendant Plan. Throughout the appeals filed by Plaintiff, Defendants upheld the denials based on the pre-existing condition language of Defendant Plan, Plaintiff's medical records, and three expert medical opinions.

24. Plan trustees who reviewed Plaintiff's appeal and the dates during which they served as Trustees are as follows:

a. Debra Popham     01/01/93—Present
b. Debra Schweitzer     01/01/93—Present
c. Victor Speier     03/31/93—Present
d. Robert Wilson     09/30/91—09/30/94

In addition to the above-named Trustees, Ms. Beverly Rothman was asked to review the appeal and cast a vote. The company for which Ms. Rothman worked had recently become part of the Plan, and at the time of the appeal, Ms. Rothman was being considered as a Trustee. Ms. Rothman is included in the term "Plan Trustees".

25. Each Defendant Plan Trustee who reviewed the Defendant Administrator's denial of benefits and cast a vote concerning Plaintiff's appeal of the denial, was an employee of Defendant Employer at the time he/she reviewed the claim and voted on Plaintiff's appeal. Ms. Debra Brower, Plan Benefits Manager, testified that to her knowledge, none of the Trustees had any formal medical training, with a possible exception of Victor Speier, who may have had medical training during service in the U.S. Army.

## C. Additional Facts

While the above stipulation provides a general overview, the Court is of the view that certain references require expanded discussion. First, the language of the governing plan document is critical to an analysis of eligibility for benefits. The Summary Plan Description included the following exclusion with respect to a "pre-existing condition:"

*A pre-existing condition is an illness or injury (including pregnancy) for which an employee or covered dependent received medical care or services within 6 months before coverage began. Charges incurred in connection with a pre-existing condition are NOT to be covered until a period of 12 consecutive months has elapsed during which the Plan participant was continuously covered under the Plan.*

(Summary Plan Description at 8–7) (italics in original).[2] "Illness" and "injury" were defined as follows:

> **illness:** a mental or physical disease or infirmity, including pregnancy or pregnancy-related conditions of an *employee* or *covered dependent.*

> **injury:** an accidental physical injury to the body caused by unexpected external means which does not arise out of or in the course of employment. All injuries sustained in connection with one accident are considered to be one injury. *Injury* does not include disease or infection, except pyogenic infection occurring through an accidental cut or wound.

(*Id.* at 11–7) (italics in original).

The circumstance leading to the original prostate examination merits further explanation. Thompson testified he was asked to take the physical as a condition of employment and was referred to Dr. Paul McFadden. (Thompson depo. at 12). He said it was his first physical examination in approximately two years. (*Id.* at 13). Thompson further testified as follows:

> Q. [A]s part of your physical with Dr. McFadden, did you have a check of your prostate, is that correct?

> A. That is correct.

> Q. How did that come about?

> A. When we were finished with the physical, Dr. McFadden was sitting at his desk, and I recall that he was just filling out—he just turned and said, is there anything else I should check. Not having been to a doctor, basically, for two years and not getting regular physicals and so on and having driven across country from Albuquerque to Dover, I had been listening to the radio. And Michael Milken, the junk bond mega millionaire and so on, who is—there was some comment about that it had been discovered that he had inoperable prostate cancer.

And as I was standing there, I just said, I'm 48 years old, what does that entail? He says, well, I can do it in a minute. I mean, I can check your prostate is what he said. I said, okay, why don't we check it. And then he did.

(*Id.* at 14–15). Dr. McFadden also recommended a prostatic specific antigen ("PSA") test, requiring the drawing of blood, which was performed at a local hospital. Dr. McFadden advised Thompson to return for a follow-up visit in four months. Dr. McFadden's office notes stated with respect to the prostate, "The patient does have an enlarged prostate with an indurated area in the right lobe.... No restrictions. Recheck the prostate in four months." (Pa.Exh. 1). On the return visit on September 10, Dr. McFadden noted that the "[t]he patient still has some slight prostate symptoms" including a "slightly elevated" PSA result of 6.3, compared to the normal range of 0 to 4.[3] (Pl.Exh. 1). He referred Thompson to a urologist for "more definitive treatment." (Id). The urologist performed a needle biopsy of the prostate, a test which indicated Thompson had a malignant growth. After consultation with several doctors, Thompson underwent surgery on November 15, 1993, for removal of the growth. The surgery required a one-week hospital stay.

The claims process merits further discussion. Simon contracts with UMR for the latter to be administrator of claims filed by Simon employees. UMR approved initial claims related to Thompson's prostate condition, including the needle biopsy which detected the cancer. However, according to the affidavit of Mary Drees, director of operations for UMR, a review of Thompson's condition was initiated after UMR was notified of the need for surgery for prostate cancer. The review led UMR to conclude that the May 24 examination by Dr. McFadden constituted medical services for a pre-existing condition and disqualified him from coverage for the prostate cancer for a period

---

**2.** The Summary Plan Description italicized all words which were defined in the definitions chapter of the document.

**3.** This was the result of the test administered in May. Dr. McFadden's medical notes made no mention of the result until the September examination.

of twelve months after joining the plan. (Drees aff'd. at ¶ 22).

The Summary Plan Description allows a plan participant to appeal an adverse benefits decision to the plan administrator.[4] The appeal process is not described in the plan other than to state that the plan administrator shall make a decision within 60 days and provide a detailed written explanation for the decision. The Summary Plan Description also states that the plan administrator "makes the final determination as to benefits payable." (Summary Plan Description at 10–5). This final decision is "conclusive" upon all persons and entities. *(Id.)*.

The actual process for considering appeals is not explained in the Summary Plan Description but was described in deposition testimony by Debra Brower, benefits manager for defendant Simon U.S. Holdings ("Simon"):

> United Medical Resources will forward to me a copy of [the request for appeal] along with any documentation that Mr. Thompson would have sent along requesting his appeal. UMR forwards this to me, and then I, in turn, make copies of it and forward it either by fax or by mail to each of the voting trustees at that time requesting them to make their decision on whether they approve or deny the claim based on the facts that are enclosed. And they respond back to me and I respond back to UMR with their findings.

(Brower depo. at 56). In this particular case, each trustee received a copy of the following letter addressed to Brower and written by UMR's Drees:

> To date, we have denied charges for the above patient's prostate condition since it was determined to be a pre-existing condition as defined by the Plan. The patient was effective with the Plan on July 1, 1993. He was seen May 24, 1993 for a physical and at that time asked to have the prostate checked. The physician noted an enlarged prostate. On September 1, 1993, the patient returned for a prostate check and the physician referred him to a urologist.

> Since that time, the patient has incurred $27,198.22 in charges related to the prostate condition. The member does not feel that this should be considered pre-existing. I have attached all office notes and information about the condition for your review. If you would like to discuss this further, please feel free to contact me.

(Def.Exh. A). Drees' letter did not state that prior claims related to Thompson's prostate condition had been approved.

Brower testified the trustees do not meet as a group; they merely are sent the relevant information and asked to vote whether to approve or deny the claim. (Brower depo. at 55–56). In this case three of the five plan trustees voted to deny the claim; one voted to approve the claim; and the fifth proposed a 50–50 share of expenses.

Plan trustees are selected by the director of benefits of Simon's parent company in England. *(Id.* at 38). They included members of various subsidiaries owned by the parent company. Voting as trustees at the time of Thompson's appeal were Beverly Rothman, controller for Simon Hydrosearch; Deborah Popham, director of personnel for Simon Telelect; Victor Speier, vice president of finance for Simon Aerials; Deborah Schweitzer, director of human resources at Simon Ladder Towers; and Robert Wilson, whose title is not a part of the record. *(Id.* at 61–64). None of the trustees had any medical training, with the possible exception of Speier, whom Brower believed served in some medical capacity for the United States Army during the Vietnam War. *(Id.).*

Three medical opinions are a part of the record. It appears all three were solicited and obtained after the appeal process was complete and while Thompson, through counsel, was unsuccessfully seeking reconsideration of the appeal. The plaintiff provided Simon with an opinion provided by Dr. William Wilder which stated in pertinent part:

> [The PSA] is a test that is done and abnormal results can either be related to benign prostatic hypertrophy or prostate cancer.

4. The Summary Plan Description defines the "claims administrator" as UMR and the "plan administrator" as Simon.

The test alone is not a diagnostic test for cancer of the prostate.

At the time of the pre-employment physical the patient had no symptoms and the finding of an enlarged prostate is not in itself an abnormal finding that would require further treatment.

In many men the prostate does become enlarged but does not cause symptoms and therefore no treatment is indicated.... There is great controversy about the level of PSA result that needs to be addressed with further treatment. The usual feeling is that a level between 4 and 9 is not diagnostic of cancer nor of benign prostatic enlargement. Levels of 9 and above have been related to a higher incidence of cancer of the prostate but that is not conclusive evidence either. The only conclusive evidence of prostate cancer is determined through a needle biopsy of the prostate. Therefore it is apparent that the patient did not have any disease for which he was treated at the time of the initial examination and it was only after he went back for a recheck of his prostate enlargement in September 1993 that he was sent to a urologist who did a prostate biopsy and found the diagnosis of cancer of the prostate. The treatment was then instituted which was surgery for the removal of the prostate cancer.

It is my opinion as a specialist in internal medicine, that the mere finding of an enlarged prostate does not indicate a disease process without symptoms and without further diagnostic studies. Therefore I would suggest that the patient did not have any ongoing medical treatment and at the most he was notified that he should have observation of his prostate gland at a future date.

(Joint Exh. 3).

In denying the request for reconsideration, the defendants' counsel provided Thompson with two medical opinions it had solicited. The first is a brief review of Thompson's claim by James M. Hochwalt, M.D., medical director of defendant UMR. In determining Thompson was not eligible the coverage for prostate cancer treatment, Dr. Hochwalt stated the following:

[Thompson's] condition was noted and discovered in May which was pre-existing to his effective date of July 1, 1993. The fact that the patient claims he had no symptoms at the May visit is not relevant in determining the pre-existing condition. Also, the fact that the patient's diagnosis occurred after his effective date is not applicable because the condition was noted and discovered previous to his effective date, and this makes his condition pre-existing.

(Joint Exh. 1). The defendants also solicited a review by the Medical Review Institute of America, Inc. Curiously, the record does not indicate that the review is signed by a named physician. Instead, at the conclusion it states, "The physician providing this review is a Urologist who is certified by the American Board of Urology and is a Fellow, American College of Surgeons." (Joint Exh. 2). It further describes the reviewer as having been active in clinical and administrative settings for more than 25 years. (*Id.*). This review concluded, based upon a record it considered "very limited," that "[t]he condition appears to be pre-existing." (*Id.*). It stated, "The presence of the induration and the PSA elevation on 5/24/93 is presumptive evidence of carcinoma of the prostate until proven otherwise." (*Id.*).

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. When considering a motion for summary judgment, "the inferences to be drawn from the underlying facts contained in [affidavits, pleadings, depositions, answers to interrogatories, and admissions] must be viewed in the light most favorable to the party opposing the motion." *U.S. v. Diebold Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). *See, e.g., U.S. v. Hodges X–Ray, Inc.*, 759 F.2d 557, 562 (6th Cir.1985) and cases cited therein. The Court's favorable treatment of facts and inferences, however, does not relieve the nonmoving party of the responsibility "to go beyond the pleadings" to oppose an other-

wise properly supported motion for summary judgment under Rule 56(e). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

Once the moving party satisfies his or her burden to show an absence of evidence to support the nonmoving party's case, *Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. at 2552–53, the party in opposition "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). Although the showing required of the nonmoving party by Rule 56 does not go so far as to require that all opposition evidence. *Id.* in a form admissible at trial, the rule does require the nonmoving party who has the burden of proof at trial to oppose a proper summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves...." *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. at 2553. General averments or conclusory allegations of an affidavit, however, do not create specific fact disputes for summary judgment purposes. *See Lujan v. National Wildlife Federation,* 497 U.S. 871, 888–89, 110 S.Ct. 3177, 3188–89, 111 L.Ed.2d 695 (1990). Furthermore, unsworn statements and affidavits composed of hearsay and non-expert opinion evidence, "do not satisfy Rule 56(e) and must be disregarded." *See Dole v. Elliott Travel & Tours, Inc.,* 942 F.2d 962, 968–69 (6th Cir.1991) (quoting *State Mutual Life Assurance Co. v, Deer Creek Park,* 612 F.2d 259, 264 (6th Cir.1979) and citing *Adickes v. S.H. Kress & Co..* 398 U.S. 144, 158 n. 17, 90 S.Ct. 1598, 1608–09 n. 17, 26 L.Ed.2d 142 (1970)). Nor may a party "create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts ... earlier deposition testimony." *Reid v. Sears Roebuck & Co.,* 790 F.2d 453, 460 (6th Cir.1986) (citing *Biechele v. Cedar Point, Inc.,* 747 F.2d 209, 215 (6th Cir.1984)).

On a motion for summary judgment, the Court will consider "[o]nly disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v.* *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510. Non-material facts will not be considered. Neither will the judge attempt to weigh the material evidence or determine its truth. *Anderson v. Liberty Lobby,* 477 U.S. at 249, 106 S.Ct. at 2510–11. The judge's sole function will be to determine whether there is a genuine issue for trial such that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* (citations omitted).

Where the nonmoving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," summary judgment is appropriate. *Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. at 2552 (equating the standard for a directed verdict under Rule 50(a) with the summary judgment standard of Rule 56). If the evidence is "merely colorable," or is "not significantly probative," the Court may decide the legal issue and grant summary judgment. *Anderson v. Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11 (citing *Dombrowski v. Eastland,* 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967) *(per curiam)* and *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968)). " 'The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." ' *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1477 (6th Cir.1989) (quoting *Anderson v. Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. at 2512).

In sum, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby,* 477 U.S. at 250, 106 S.Ct. at 2511.

### IV. DISCUSSION

#### A. Standard of Review

A threshold question is whether the Court should review the denial of benefits *de novo* or under an arbitrary and capricious stan-

dard of review. In *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court held that a plan administrator's decisions are entitled to an arbitrary and capricious standard of review if the plan grants the administrator discretion in construing a plan's terms. *See id*, at 111, 109 S.Ct. at 954 ("Where discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court except to prevent an abuse by the trustee of his discretion."). The arbitrary and capricious standard "is the least demanding form of judicial review of administrative action." *Perry v. United Food and Commercial Workers Dist. Unions 405 and 442*, 64 F.3d 238, 242 (6th Cir.1995) (*quoting Davis v. Kentucky Finance Cos. Retirement Plan*, 887 F.2d 689, 693 (6th Cir.1989), *cert. denied*, 495 U.S. 905, 110 S.Ct. 1924, 109 L.Ed.2d 288 (1990)). "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Davis*, 887 F.2d at 693 (quotation omitted). The arbitrary and capricious standard is the equivalent of an abuse of discretion standard. *See Perez v. Aetna Life Ins. Co.*, 96 F.3d 813, 821 (6th Cir.1996).

■ The Summary Plan Description states that the plan administrator has "the discretionary authority to interpret the Plan, including those provisions relating to eligibility and benefit determination. The Plan Administrator's interpretations and determinations are final and binding." (Summary Plan Description at 11–9). The defendants contend that this language entitles them to the less demanding arbitrary and capricious standard of review. The plaintiff concedes that the arbitrary and capricious standard is the proper standard. This Court is not convinced. The Court is struck by the fact that,

at the point a claimant files an appeal, the claim is removed from professional claims administrators and placed in the hands of a rather *ad hoc* group of trustees who have little or no medical training or knowledge.[5] Further, the trustees don't even bother to meet to discuss the claim. There is no way to determine whether some trustees gave the appeal more than a moment's thought or whether conversation between the trustees could have swayed the decision in Thompson's favor. This seems particularly critical in a situation such as the instant case when there are divergent views on the merits of the claim.[6]

The Summary Plan Description states that the plan administrator must relate the appellate decision to the claimant in writing, including "specific reasons for the decision [and] specific references to the pertinent Plan provisions on which the decision is based." (Summary Plan Description at 10–5). The full text of the letter to Thompson following appeal reads as follows:

> The Plan Administrators have reviewed your appeal regarding charges denied for being a pre-existing condition and have determined that the claim was paid correctly based on the Simon U.S. Holdings, Inc. Benefit Plan. Their decision is final and binding.
>
> We regret a more favorable decision could not be made.

(Def.Exh. 26). Such a letter is not faithful to the Summary Plan Description's requirement of specificity. Indeed, given the defendants' process for considering appeals—a process in which the trustees do not even consult with each other—it would be difficult to have fulfilled the requirement of articulating specific reasons for the denial of benefits.

---

5. According to Brower's deposition, there are "no set rule[s]" as to how and when trustees are selected. (Brower depo. at 35). In fact, Beverly Rothman, one of those voting on Thompson's appeal, was not actually a trustee at the time she voted. However, she was asked to cast a vote because she was "being considered" as a trustee at the time of the appeal. (Joint fact stipulation at ¶ 24).

6. Beverly Rothman, the "trustee" who voted in favor of a 50–50 split of expenses, wrote on her response card, "[I]f I were to base my decision *strictly* on the one or two sentences defining 'pre-existing' in our health and benefits handbook, then I would have ruled in favor of our employee." (Exh. 25). It is possible that if Rothman were to have expressed those views in a meeting among trustees, others could have been swayed by this viewpoint.

In sum, the Court is of the view that the interests inherent in ERISA are not served by applying a deferential standard of review to a haphazard decisionmaking process. It believes a *de novo* review is appropriate. However, the Court also is of the view that the denial of benefits is unjustified even under the more deferential arbitrary and capricious standard of review. Despite its view that a *de novo* standard is warranted, the Court will proceed with its analysis under the arbitrary and capricious standard because Thompson prevails even under this less exacting measuring stick.

### B. Analysis

■ A starting point in analyzing denial of ERISA benefits is the language of the contract upon which the denial was based. Thompson's benefit was denied because it was deemed to be a "pre-existing condition." The Summary Plan Description defines a "pre-existing condition" as follows:

> A pre-existing condition is an illness or injury . . . for which an employee or covered dependent received medical care or services within 6 months before coverage began.

(Summary Plan Description at 8–7) (emphases omitted). The defendants' position is simple: Thompson's prostate cancer, diagnosed in September 1993, was an "illness" for which he received "medical care or services" during his May 24 pre-employment physical. The Court is of the view that upon close inspection, no reasonable interpretation of the undisputed facts can support such a conclusion.

It appears from the briefs of the parties and the Court's own research that the most analogous cases arise in other circuits. Neither party has cited a Sixth Circuit case precisely on point. The defendants cite *Bullwinkel v. New England Mut. Life Ins. Co.*, 18 F.3d 429 (7th Cir.1994). In *Bullwinkel*, the plaintiff visited a doctor on July 20, 1991, eleven days before her insurance coverage began, because she had noticed a lump on her breast. Her doctor suggested she have the lump removed by biopsy, a procedure which took place on September 6. The lump was malignant. The plaintiff underwent surgery as well as chemotherapy and radiation treatments. The "pre-existing condition" exclusion in the insurance policy stated as follows:

> No benefits are payable for a condition, sickness, or injury for which you or your dependent were seen, treated, diagnosed, or incurred medical expense in the six-month period just before insurance starts . . .

*Bullwinkel*, 18 F.3d at 430. Based upon the above language, the defendant declined to cover the treatment. The district court, analyzing the issue *de novo* because nothing in the insurance contract required a deferential standard of review, granted summary judgment in favor of the defendant, holding that the cancer was a pre-existing condition and that the purpose of the original visit was the plaintiff's concern that the lump may be cancerous. The court of appeals affirmed. Focussing on the precise wording of the pre-existing condition clause, the appeals court noted that "a malignant breast tumor is a 'condition' and a 'sickness.'" *Id.* at 432. The court found it fair to infer that the lump, found to be cancerous in September, was also cancerous in July. Therefore, it followed that the insured was "seen" and "treated" and "incurred medical expenses" for the illness in July, rendering the cancer a pre-existing condition as defined by the insurance contract. *Id.*

However, the court stressed the fact-specific scope of the case and cautioned against reading its decision more broadly than warranted:

> Obviously, this case is not an authorization for summary judgment in all future cases dealing with pre-existing condition limitations. Several attributes make this case unique. First, the lump discovered in July was not a trivial and inconclusive symptom. [citation omitted]. Consider the hypothetical where a person purchased cough medicine in one month, then obtained insurance, only to learn in the next month that he had lung cancer, which possible [sic] caused his hacking. A district court would not be able to conclusively determine whether treatment for the cough was actually treatment for cancer, without the benefit of an evidentiary hearing. Here, there

is no need for an evidentiary hearing, because we may reasonably infer that the breast lump was cancerous in July, and the record presents no competing differences. This case is also unique because the Bullwinkels never really attempt to argue that the breast lump was benign in July. In the previous hypothetical, the insured would likely argue that the cough could have been caused by any number of maladies other than 'cancer.... Finally, this case is unique because the Bullwinkels' attorney really rested his entire appeal on the argument that a court may not infer that a lump discovered to be cancerous in one month was also cancerous two months before. But this is a reasonable inference, which becomes conclusive in the absence of competing inferences. We make no statement about what might happen if an attorney in a future case presents different arguments and authority to the court.

*Id.* at 433. The instant case is distinguishable from *Bullwinkel* in several respects. First, the language of the exclusion is far broader in *Bullwinkel,* encompassing any "condition," as compared to "illness or injury" in the instant case. Second, the *Bullwinkel* court noted that a breast lump is "not a trivial and inconclusive symptom." *Id.* In contrast, an enlarged prostate is clearly an inconclusive symptom, as millions of men who suffer from inflamed or swollen prostate glands do not develop prostate cancer.[7] It is not reasonable to assume swelling of the prostate is the equivalent of prostate cancer.

Given the Seventh Circuit's hint at the conclusion of *Bullwinkel* that different facts could compel a different conclusion, it is not surprising the same circuit decided a recent breast cancer case differently. *Pitcher v. Principal Mut. Life Ins. Co.,* 93 F.3d 407 (7th Cir.1996) featured a pre-existing condition clause very similar to the clause in the instant case. The *Pitcher* clause read as follows:

A Pre-existing Condition is a sickness or injury for which a Member or Dependent is confined or received treatment or service in the 90–day period before he or she became insured under this policy.

*Pitcher,* 93 F.3d at 409.

The plaintiff had long suffered from a fibrocystic breast condition in which benign lumps would frequently form in her breasts. Lumps in both breasts were detected in a routine physical examination on July 31, 1992. The plaintiff was advised to abstain from caffeine in an effort to cause the lumps to abate. She had a follow-up visit on September 15, 1992, two days before her health insurance policy became effective. The lumps had not subsided, and the doctor referred her to a radiologist for a mammography exam of both breasts that day. The exam revealed a suspicious mass in the left breast warranting a biopsy, which was performed September 18, one day after her insurance became effective. The biopsy revealed a cancerous tumor, which was removed by surgery on October 5.

The insurance company refused to provide coverage on the basis that the plaintiff had received "treatment or service during the pre-existing condition period for the symptoms of a sickness which ultimately proved to be breast cancer." *Pitcher,* 93 F.3d at 410. The trial court granted the plaintiff's motion for summary judgment and denied the insurance company's motion. The trial court found that the plaintiff had not received "treatment or service" for *breast cancer* in the pre-coverage period. The court of appeals affirmed in reasoning which merits extended quotation, given the similar contractual and factual provisions to this case:[8]

The key question in this appeal is whether, in the words of the policy, *Pitcher received a "treatment or service" for breast cancer during the ninety-day period prior to the effective date of coverage (September 17, 1992), and not whether Pitcher actually had breast cancer during this time period.* The only events that could arguably constitute such a "treatment or service" are (1)

---

7. Newsweek magazine of January 6, 1997, at page 74, citing scientific studies, stated that 14 million American men suffer from benign swelling of the prostate. Only a small percentage of those men suffer from prostate cancer.

8. All of the italics are in the original.

the routine physical examination on July 31, during which Dr. Manifold detected lumps in both breasts that he believed to be the result of Pitcher's longstanding fibrocystic breast condition, (2) the follow-up exam with Dr. Manifold on September 15, or (3) the mammogram (administered on September 15) [footnote omitted].

Interpreting the language of Principal's insurance policy "[i]n an ordinary and popular sense as would a person of average intelligence and experience," [citation omitted], we hold that Pitcher did not receive a "treatment or service" for breast cancer prior to September 17, 1992 because—as the district court found—she was being monitored for the longstanding fibrocystic breast condition and not cancer during the pre-coverage period....

The record establishes that Pitcher's primary care physician, Dr. Manifold, did not render a *"treatment or service" for breast cancer* when he conducted a routine physical examination in late July 1992.... The "treatments" or "services" rendered by Dr. Manifold on this occasion ... had nothing to do with breast cancer and were directed at the fibrocystic breast condition. The follow-up exam on September 15, likewise, fails to meet the test of a "treatment or service" *for* breast cancer. The sole purpose of this examination was to determine whether abstaining from caffeine, as directed, had alleviated the symptoms of the fibrocystic breast condition.... Principal attempts to characterize the lumps felt by Dr. Manifold in July and late September as symptoms of the as-yet undiagnosed breast tumor, but the record does not support this speculative characterization.

.    .    .    .    .

Was the mammogram (administered September 15) a "treatment or service" for breast cancer? We note, first, that *a mammogram is not "treatment" for breast cancer (or anything else), for it is a purely diagnostic procedure.* Treatment, as this court has recognized, "occurs when a health care provider takes steps to *remedy or improve* a malady." [citation omitted]. If, as we hold, the mammogram was not a *"treatment"* for Pitcher's breast cancer,

could the mammogram be considered a *"service"* for the breast cancer within the meaning of the policy's language? While a mammogram can be classified as a medical "service," it was *not* a service *for* Pitcher's breast cancer but a service rendered solely for and in connection with the ongoing monitoring of her fibrocystic breast condition....

*Pitcher*, 93 F.3d at 416. Finally, the court of appeals in *Pitcher* distinguished the case from *Bullwinkel* by noting 1) the plaintiff in *Bullwinkel* sought treatment specifically because she found a lump and was concerned about breast cancer, and 2) the pre-existing clause in *Bullwinkel* was far broader:

> The ultrasound examination of Bullwinkel's breast triggered the policy's pre-existing condition clause because the detailed and all-inclusive language of her policy *explicitly referred to diagnostic procedures.* The brief definition of "pre-existing condition" in the Principal policy, by contrast, is less specific; it makes no mention of diagnostic procedures and states only that a "pre-existing condition" is a "sickness or injury *for which* [an insured] received *treatment or service* in the 90–day period before he or she became insured under this policy." As discussed above, we are convinced that the medical attention Pitcher received for her fibrocystic breast condition in the ninety-day period before September 17, 1992 cannot be considered "treatment or service" *for* breast cancer.

*Id.* at 416 (emphasis in original).

The Court finds this case factually and legally similar to *Pitcher*. The pre-existing condition clauses are nearly. identical in relevant part:

| Simon Policy | Pitcher Policy |
|---|---|
| A pre-existing condition is an *illness or injury* ...for which an employee or covered dependent received *medical care or services within* 6 months before coverage *services within* 6 months before coverage *services began.* | A pre-existing condition is a *sickness or injury* for which a Member or Dependent is confined or received *treatment or service* in the 90–day period before he or she became insured under this policy. |

The Court adopts the *Pitcher* court's reasoning that the proper inquiry is not whether Thompson actually had prostate cancer on May 24, 1993. Rather, the question is

whether he *received "medical care or services" for prostate cancer* at that time. Reading the pre-existing condition clause as a whole, no other conclusion can reasonably be drawn. The clause does not disqualify Thompson if he had the "illness" of prostate cancer on May 24; it disqualifies him if he *received "medical care or services" for that illness at that time.*

The record simply does not support the conclusion that Dr. McFadden's one-minute prostate exam and his ordering of a PSA test constitutes "medical care or services" *for prostate cancer.* The purpose of Thompson's visit was an employer-ordered physical; it was not to relate concerns about prostate problems.[9] After the doctor asked him if there was anything he wanted to ask about, Thompson queried whether he should have a prostate exam. The doctor examined the prostate and merely noted "enlarge[ment]" and "induration" and recommended a blood test, the results of which he did not note for four months. The doctor noted that Thompson had "no restrictions" and recommended no treatment or care beyond a return visit in four months. By no stretch can this brief exchange between doctor and patient be construed as "medical care or services" *for prostate cancer.*

The *Pitcher* case turned in part upon the distinction between a fibrocystic breast condition and breast cancer. The court properly noted that fibrocystic symptoms are not necessarily an indication of breast cancer. Similarly, an enlarged prostate is not necessarily an indication of prostate cancer. Even if Dr.

McFadden's limited work could be construed as "services" for an enlarged prostate, by no reasonable construction could the care be construed as "services" for prostate cancer.[10]

■ Before concluding, the Court finds it instructive to revisit the issue of proper standard of review. For reasons explained above, the Court believes from a *de novo* perspective that the decision to deny benefits was patently erroneous. However, the Court is of the view that the decision also fails under an arbitrary and capricious standard because both the *process* and the *decision* were fatally flawed.

The process selected by the defendants to consider appeals did not ensure thorough consideration meriting deferential review by the Court. The "trustees" considering Thompson's appeal had no specialized knowledge meriting deferential review, nor did they even consult with one another to crystallize the important issues of the appeal. The defendants also failed to relate specific reasons for the denial of the appeal to Thompson as required by the Summary Plan Description. Moreover, even though the decision of the plan administrator was purportedly "final" and "conclusive," the record indicates that the medical opinions, including the two opinions solicited by the defendants, were developed *after* the trustees made their "final" decision. These opinions "reaffirm[ed]" and "confirm[ed]" the previous denial, according to letters sent from the defendants' counsel to Thompson's counsel. (Joint Exh. 9).[11] There is no indication these medi-

---

9. Indeed,. Thompson testified, and the defendants do not dispute, that he was not experiencing any prostate-related problems.

10. Indeed, if the doctor believed he was providing "services" for prostate cancer, he would have done more than recommend a return visit in four months. This self-evident proposition is supported in the record by the doctor's reaction upon Thompson's return visit when the prostate was still enlarged and indurated and the doctor was aware of a "slightly elevated" PSA level. The doctor then referred Thompson to a urologist "for more definitive treatment."

11. Indeed, an examination of the medical opinions raises serious questions as to the quality of review by the defendants' medical experts. The first review, by Dr. Hochwalt, medical director of UMR, has no persuasive value because it fails to

make the critical distinction between an enlarged prostate and prostate cancer. In his very brief report, Dr. Hochwalt twice stated as dispositive the fact that Thompson's "condition" was "noted and discovered" prior to coverage. As previously detailed, all that was "noted and discovered" during the May 24 exam was an enlarged prostate. That is not the equivalent of prostate cancer. The value of the second review is diluted because it was unsigned. More importantly, it misses the key point of whether *prostate cancer* was the subject of the medical care and services provided by Dr. McFadden. On the other hand, the report provided by the plaintiff's expert was more detailed and properly focussed on the fact that treatment for an enlarged prostate is not the equivalent of treatment for prostate cancer.

cal reports were given to the "trustees" who purportedly made the final decision on Thompson's appeal, and it is unclear just who "confirmed" and "reaffirmed" the denial. In sum, the Court concludes that the appeals "process," such as it is, substantially enhances the possibility that a claimant will be the victim of an arbitrary and capricious result.[12]

Given the combination of a seriously flawed process and a clearly erroneous conclusion, the Court finds that the decision to deny benefits to Thompson was arbitrary and capricious, i.e., it was not "rational in light of the plan's provisions." *Daniel v. Eaton Corp.,* 839 F.2d at 267.[13]

## V.  CONCLUSION

For the reasons set forth above, the Court denies the defendants' motion for summary judgment (Docket No. 18) and grants the plaintiff's motion for summary judgment (Docket No. 21). The parties have stipulated that the bills not paid due to denial of benefits total $31,261.25. (Joint Fact Stipulation at ¶ 22). Accordingly, the Court shall publish a judgment entry contemporaneously with the issuance of this memorandum opinion awarding judgment in favor of the plaintiff in that amount. By another separate order the Court will address the plaintiff's request for attorney fees.

IT IS SO ORDERED.

**12.** Defendants submit evidence that they denied claims for two other claimants based upon pre-existing conditions and argue that this consistency lends support to the conclusion that the denial of Thompson's claims was not arbitrary. The argument is flawed in at least two respects. First, in those cases it appears the patient was treated for the same conditions in both the pre-existing period and the eligible period. As described in detail previously, that is not the case here. Second, those appeals were subject to the same flawed process as has been described in this case.

**13.** In so deciding, the Court need not address what it considers a potentially strong alternative argument, i.e., that the defendants should be estopped from denying benefits for the prostate surgery when they had approved all other charges related to his prostate condition up to that time, thereby inducing Thompson to reasonably assume that the surgery would be covered.